ALEXANDER RENLUND v. COMMODORE MINING COMPANY.[1]

February 27, 1903.

Nos. 13,200—(226).

## Death by Wrongful Act—Fellow Servant.

In an action to recover damages for the death of a laborer in a mine, caused by the negligence of the master in controlling its skip cars, *held*, the capacity in which the foreman was acting, and the question of his negligence, were proper questions for the jury, and the evidence reasonably tended to support the verdict.

## Nonresident Alien.

Nonresident aliens who are next of kin are entitled to the benefits conferred by G. S. 1894, § 5913.

Action in the district court for St. Louis county by plaintiff, as administrator of the estate of John Erickson, deceased, to recover $5,000 for the death of decedent. The case was tried before Dibell, J., and a jury, which rendered a verdict in favor of plaintiff for $1,000. From a judgment entered pursuant to the verdict, defendant appealed. Affirmed.

*John G. Williams*, for appellant.

*Adams & Miller*, for respondent.

LEWIS, J.

This action was commenced under G. S. 1894, § 5913, for the benefit of the next of kin of the deceased, who lost his life while working in the defendant's mine. The accident occurred as follows: There was a shaft three hundred seventy-two feet deep, at an angle of about twenty-seven degrees, in which were operated two skip tracks, separated by timbers about four feet apart. On these tracks two skip cars were arranged to balance each other, so that, when one was going up, the other would be going down. The skips were run by an engine at the upper end of the shaft. On the right side of the shaft was a stairway running parallel with it, and extending from the surface to within a few feet of the bottom. The second and third levels were being operated,

[1] Reported in 93 N. W. 1057.

the latter being at the bottom of the shaft. In going out of the mine the men on the third level were compelled to go up the skip track a certain distance until they reached the stairway. On the evening of the accident the men gathered at the foot of the shaft, waiting for a signal to go up. The charge of negligence is based upon the claim that the skip boss, who was in charge of the men on the third level, while acting in the capacity of vice principal, assumed control of the skip, and directed the men to go upon the skip track, in order to reach the stairway, and that, while the deceased was going up, the right-hand skip car was rung down, and caught and killed him before he reached the ladder.

The assignments of error present two questions: Whether there was evidence reasonably tending to establish negligence of defendant? And whether any recovery can be maintained in this action, for the reason that the beneficiary under the statute, the mother of the deceased, is a nonresident alien?

1. The question of negligence turns upon whether the skip boss, Jacobson, at the time he directed the men to pass up the right-hand skip track, and gave the signal for the movement of the skip car, was a fellow servant of the deceased, or whether he was acting in the capacity of a vice principal.

The evidence is quite conclusive that the men were directed by Jacobson in the manner stated, and, according to his own statement, he gave the signal for the skip car upon the right-hand side to go up, but for some reason it came down.

In respect to what capacity Jacobson was acting, the court instructed the jury that it was the duty of defendant to exercise reasonable care to provide a reasonably safe and suitable place in which its servants might perform the duties assigned them, including suitable means of egress from the mine, and to keep and maintain such place in a reasonably safe and suitable condition, and to see that the work was carried on in a manner reasonably safe to its employees; that the employer could not delegate to another the performance of such duties, and thereby escape liability; and that the person to whom such duties were delegated was the vice principal of the master, and for his negligence in their performance the master was liable. The court also instructed

the jury that a foreman, mining captain, or superintendent might, in respect to some specific work, be a fellow servant, and in other respects be a vice principal; that if the method of carrying on the work required that the master exercise reasonable care in directing the movements of the men as they were leaving the mine, and if the master delegated such duty to the shift boss, and he was negligent in the performance thereof, then such negligence was the act of the master. The trial court here laid down very concisely and accurately the principles of law governing the case, and no exceptions were taken thereto.

But it is claimed that it conclusively appears from the evidence that the skip boss, Jacobson, was acting in the capacity of a fellow servant. In our judgment, the court was correct in submitting this question to the jury. It will be admitted that if the skip boss had no authority as a general foreman or superintendent, and it was not a part of his duty to assume charge of and direct the movements of the men as they passed out of the mine, then, if he assumed to perform an act which was beyond the scope of his duty, and attempted to direct the men and control the skip, such act of negligence would not be attributable to the master. It will also be conceded that if it was the duty of the skip tender, Johnson, to control the movements of the car at the time the men made egress from the mine, and, being otherwise engaged at this particular moment, he permitted Jacobson, who had no authority to thus interfere, to perform that duty for him, and the accident occurred by reason of his negligence, in that case the master cannot be held liable. But if, in addition to his duties as skip boss, there was conferred by the master upon Jacobson the additional duty of general supervision and control of the men in that shaft during the absence of the captain or superintendent, and it was a part of such duty to see that the men made a safe exit from the mine, and he was in the exercise thereof at the time in question, then his acts were not those of a fellow servant, but were in pursuance of the duty imposed upon him as a vice principal. There was some conflict in the testimony as to the nature of Jacobson's duties, but there was evidence tending to show that it was his custom to assume general charge of the men, and direct their

movements in a general way while in the shaft, including the method and manner of going out of the mine. It does not conclusively appear that this duty was imposed upon the skip tender, Johnson, and, under the evidence, it was a question for the jury to determine in what capacity Jacobson was acting, and whether he was negligent. Hess v. Adamant Mnfg. Co., 66 Minn. 79, 68 N. W. 774; Perras v. A. Booth & Co., 82 Minn. 191, 84 N. W. 739, 85 N. W. 179.

2. A more important question is the effect to be given to section 5913 of the general statutes. It is insisted that the statute has application only within the state of Minnesota. The argument is based upon the general principal of construction that statutory law has no extraterritorial force, for the reason that a legislative body is presumed to legislate only for the persons within the territorial limits of its own government. The act in question is copied after what is known as "Lord Campbell's Act," first adopted in England in 1846; and its scope and purpose were defined in Schwarz v. Judd, 28 Minn. 371, 10 N. W. 208, where it was stated that the theory of the statute is that the widow and next of kin have a pecuniary interest in the life of the deceased, and that its object was to compensate them for the loss caused by his death. We may therefore eliminate from this discussion the idea that the statute was intended to be in the nature of a penalty upon the party charged with negligence, and that the measure of damages should be in accordance with the degree of culpability.

The English court, in the case of Adam v. British, L. R. 2 Q. B. Div. (1898), 430, held that the act did not apply for the benefit of aliens abroad, and stated the proposition thus: "Statutes must be understood, in general, to apply to those only who owe obedience to the laws, and whose interests it is the duty of the legislature to protect. Natural born subjects, and persons domiciled or resident within the kingdom, owe obedience to the laws of the kingdom, and are within the benefits conferred by the legislature; but no duty can be imposed upon aliens resident abroad, and with them the legislature of this country has no concern, either to protect their interests or to control their rights." It was further stated in the opinion that there was nothing in the act which

either expressly or by implication warranted the conclusion that the legislature intended to give the act extraterritorial force.

Lord Campbell's act has been re-enacted, with certain changes, in many of the states of this country, but the main and essential feature—that of compensation—has generally been distinctly reserved. The first case to which our attention has been called where the statute was under consideration in this country is Deni v. Pennsylvania, 181 Pa. St. 525, 37 Atl. 558. In that case it was held that a nonresident alien mother could not maintain the action against a citizen of the state, and the opinion is based upon the decision of the English courts; and the argument was made in the opinion that the statute should not be held to have extraterritorial force, for the reason that it did not appear that the foreign country in which the mother resided had enacted similar statutes for the benefit of aliens resident in that state. The decision was apparently based upon the same doctrine applied in the case of Knight v. West Jersey, 108 Pa. St. 250, where it was held that, while a foreign statute has no extraterritorial force, rights under it, not contrary to the policy of the state, would by comity be enforced by remedies according to the procedure of the state; and the court seemed to be impressed with the idea that unless the same privilege had been extended to the state of Pennsylvania by the foreign government, under the doctrine of comity, that state was under no obligation to extend favors to the citizens of such foreign government.

The next case having this subject under consideration is that of Mulhall v. Fallon, 176 Mass. 266, 57 N. E. 386. In that state the statute differed somewhat from Lord Campbell's act and from our own statute, in that it specifically provided that the damages should be assessed in proportion to the degree of culpability of the party charged with the negligence. It was held that the next of kin, although a nonresident alien, might maintain the action. It is insisted by appellant that the decision rests upon the peculiar provisions of the Massachusetts statute; and while it is true that the court discussed the different classes of actions, and held that the act is primarily one of penalty, yet we are not ready to admit that the decision was based upon such narrow ground. We

think the court intended to adopt the broad principle that the act had extraterritorial application, from the fact that the English authorities and the Pennsylvania case above referred to were discussed, and not approved of, and particular attention called to the difference between duties and rights in the effect to be given legislative enactment.

The next case in order of time dealing with this question is that of Kellyville v. Petraytis, 195 Ill. 215, 63 N. E. 94, where it was also held that a nonresident alien might maintain an action under the mining statutes of that state. The decision is based apparently, upon the case of Mulhall v. Fallon, supra.

The latest case on the subject is that of McMillan v. Spider Lake, 115 Wis. 332, 91 N. W. 979, where it was held that a nonresident alien could not maintain the action. The opinion reviews many of the authorities, and follows the Pennsylvania court, and attempts to distinguish the Massachusetts statute and the decision of that court.

In all of these cases it was conceded that the legislature had the power to confer such right upon aliens, and the only question was whether it was so expressed. The question, therefore, comes to us as one of first impression and without any well-defined rules to guide us, so far as we are able to determine from the decisions of this country. In the first place, it must be admitted that there can be no valid distinction in the relation which exists between the several states of the United States and between a state and a foreign nation. There are no constitutional restrictions which limit the application of this statute in favor of the residents of other states and against nonresident aliens. But the argument is made that on account of the close relation of the states, and their connection with the general government, such discrimination was intended, and should be made.

Such a distinction does not seem to us to be founded upon any sound principle. There is no more reason for extending the application of the statute to a resident of another state than there is in extending it to the benefit of a foreign subject. In the following cases similar statutes were construed, and the rule adopted that words importing general application will not be restricted

to the citizens or residents of the state. Philpott v. Missouri, 85 Mo. 164; Chesapeake v. Higgins, 85 Tenn. 620, 4 S. W. 47; Augusta v. Glover, 92 Ga. 132, 18 S. E. 406. In these cases the party for whose benefit the action was brought was a resident of a sister state. But there is nothing in the reasoning of the court, or upon principle, which would justify a denial of the remedy to an alien nonresident. In Luke v. Calhoun, 52 Ala. 115, under a statute which provided a penalty for murder, in favor of the widow or next of kin, the court held that the language of the statute was comprehensive, and was intended to extend to an alien nonresident; and in that case the widow who brought the action was a resident of Great Britain.

Turning now to the language of our own statute, there is not a word or expression indicating an intention to limit its application to persons residing within the state, or to residents of sister states. The object of the statute was to remedy the harshness of the common law, and in some degree compensate those dependent upon the person killed. It would indicate an unnatural and selfish motive to draw a distinction between the dependent relatives who reside in another state or foreign government, and those residing in our own state; and, unless such intention is manifest, we are not at liberty to assume that the lawmakers were legislating upon any such basis. As stated by the learned Chief Justice in Mulhall v. Fallon, supra, it is well known that a large percentage of the laborers who come within the borders of the state to seek employment leave their families and relatives behind. We think it is more in accordance with the spirit of the age that this statute be construed to have a universal application, and that it is intended to restore to the dependent, wherever the place of residence, in some degree, compensation for a loss resulting from an act of negligence committed within the state.

Judgment affirmed.