JAMES BURGESS, *Admr., etc. v.* JAMES GILCHRIST

(No. 9198)

Submitted October 14, 1941. Decided December 2, 1941.

*Lilly & Lilly* and *Ira P. Hager,* for plaintiff in error.
*Rummel, Blagg & Stone* and *B. J. Pettigrew,* for defendant in error.

728

Rose, Judge:

This writ of error brings here for review the order of the Circuit Court of Kanawha County which reversed the judgment of the Court of Common Pleas of that county in favor of James Burgess, administrator of the estate of Frank Burgess, deceased, and against James Gilchrist for $7,000.00, set aside the jury's verdict, and awarded the defendant a new trial.

This action is based on the death of the plaintiff's intestate resulting from his having been struck by an automobile owned and driven by the defendant. No demurrer was interposed to the declaration, and the only plea was that of the general issue. At the conclusion of the plaintiff's evidence, a motion to strike was made and overruled. After the introduction of defendant's evidence, and plaintiff's rebuttal, and the instructions of the court, the jury returned its verdict, to set aside which, a motion was made and argued. The record shows that after this argument, the following proceedings were had: "* * * the Court stated that he was of opinion to and would sustain said motion and would set aside said verdict of the jury and grant the defendant a new trial, to which opinion, ruling and action of the Court, the plaintiff, by counsel, at the time objected and excepted; and later, on said day, before an order had been entered in this case, the plaintiff requested and moved that he be permitted to be further heard on said motion of the defendant to set aside the verdict of the jury, and that said motion of the defendant be re-argued and re-submitted to the Court." This motion for re-argument was sustained, and some days later, the motion to set aside the verdict was re-argued and overruled, whereupon judgment was entered on the verdict. Upon writ of error to the circuit court, the judgment of the court of common pleas was reversed and a new trial awarded, and to this action of the circuit court, the plaintiff obtained this writ of error.

Five specific grounds were assigned for setting aside the verdict, but the argument here may be summarized

under two heads: (1) That the plaintiff can have no recovery by reason of the fact that the plaintiff's intestate was a citizen of Italy and all his distributees are citizens and residents of that kingdom; and (2) that the verdict is not supported by the evidence and is against the clear preponderance thereof.

The decedent was an unnaturalized Italian who had resided in the United States since 1903, and whose wife and children were, and have ever been, residents and subjects of the Kingdom of Italy. It is insisted that the statute of this state, Code, 55-7-5, creating a right of action for the benefit of the distributees of one whose death resulted from the wrongful act, neglect or default of another, is not intended to benefit non-resident aliens, for whom the state has no responsibility, and that therefore this action cannot be maintained. American statutes authorizing recovery for wrongful death are merely adoptions, or adaptations, of the English "Lord Campbell's Act", enacted by the British Parliament in 1846. Our statute, like its prototype, clearly created a new right of action and operated for the benefit, not of the decedent's estate, but of his distributees. The English courts decided at first that their "Lord Campbell's Act" should not be construed as being for the benefit of non-resident aliens, and that, therefore, no action would lie under that act for the death of a resident alien whose distributees were non-resident aliens. *Adam* v. *British, etc., SS. Co.,* 2 Q. B. 430. But in the subsequent case of *Davidsson* v. *Hill,* 2 K. B. 606, this position was reversed. The doctrine of the *Adam* case was adopted in some states of the Union on the theory, apparently, that they should follow the construction given the statute in England, whence the American statutes had been derived. *Deni* v. *Pennsylvania R. Co.,* 181 Pa. 525, 37 A. 558, 59 Am. St. Rep. 676; *McMillan* v. *Spider Lake Saw-Mill & Lumber Co.,* 115 Wis. 332, 91 N. W. 979, 60 L. R. A. 589, 95 Am. St. Rep. 947; *Cleveland, etc., Ry. Co.* v. *Osgood* (Ind. App.), 70 N. E. 839. A later Pennsylvania case so holding was affirmed by the Supreme Court of the United States in *Maiorano* v. *Baltimore & Ohio R. Co.,*

213 U. S. 268, 29 S. Ct. 424, 53 L. Ed. 792. But most state courts have refused to follow this harsh doctrine. *Luke v. Calhoun County,* 52 Ala. 115; *Ferrara v. Auric Mining Co.,* 43 Colo. 496, 95 P. 952, 14 L. R. A. (N. S.) 964; *Szymanski v. Blumenthal,* 3 Pennewill (Del.) 558, 52 A. 347; *Augusta Railway Co. v. Glover,* 92 Ga. 132, 18 S. E. 406; *Kellyville Coal Co. v. Petraytis,* ˙195 Ill. 215, 63 N. E. 94, 88 Am. St. Rep. 191; *Romano v. Capital City Brick & Pipe Co.,* 125 Iowa 591, 101 N. W. 437, 68 L. R. A. 132, 106 Am. St. Rep. 323, 2 Ann. Cas. 678; *Atchison T. & S. F. Ry. Co. v. Fajardo,* 74 Kan. 314, 86 P. 301, 6 L. R. A. (N. S.) 681; *Trotta's Admr. v. Johnson,* 121 Ky. 827, 90 S. W. 540, 12 Ann. Cas. 222; *Mulhall v. Fallon,* 176 Mass. 266, 57 N. E. 386, 54 L. R. A. 934, 79 Am. St. Rep. 309; *Renlund v. Commodore Mining Co.,* 89 Minn. 41, 93 N. W. 1057, 99 Am. St. Rep. 534; *Alfson v. Bush Company, Ltd.,* 182 N. Y. 393, 75 N. E. 230; *Pittsburgh, C. C. & St. L. Ry. Co. v. Naylor,* 73 Ohio St. 115, 76 N. E. 505, 3 L. R. A. (N. S.) 473, 112 Am. St. Rep. 701; *Chesapeake, O. & S. W. R. Co. v. Higgins,* 85 Tenn. 620, 4 S. W. 47; *Anustasakas v. International Contract Company,* 51 Wash. 119, 98 P. 93, 21 L. R. A. (N. S.) 267, 130 Am. St. Rep. 1089.

An influential case was *Mulhall v. Fallon, supra,* the opinion in which was written by Chief Justice Holmes. The opinion says: "In all cases the statute has the interest of the employees in mind. It is on their account that an action is given to the widow or next of kin. Whether the action is to be brought by them or by the administrator, the sum to be recovered is to be assessed with reference to the degree of culpability of the employer or negligent person. In other words, it is primarily a penalty for the protection of the life of a workman in this State. We cannot think that workmen were intended to be less protected if their mothers happen to live abroad, or less protected against sudden than against lingering death. In view of the very large amount of foreign labor employed in this State, we cannot believe that so large an exception was silently left to be read in." In *McGovern v. Philadelphia & Reading Ry. Co.,* 235 U. S. 389, 35 S. Ct. Rep. 127, 129, 59 L. Ed. 283, the Supreme Court of the

United States accepted this doctrine, basing its conclusions largely on *Mulhall* v *Fallon, supra,* and distinguishing the instant case from *Maiorano* v. *Baltimore & Ohio R. Co., supra,* by the explanation that "The Maiorano case came to this court on writ of error to the Supreme Court of Pennsylvania, where the doctrine of the Deni case was repeated and applied. This ruling was simply accepted by this court as the construction of the state statute by the highest court of the State."

It is also urged that by reason of Presidential Executive Order No. 8785, promulgated June 14, 1941, forbidding the transfer of funds, property or credit from the United States to foreign countries, except pursuant to a permit of the Treasury Department, makes a recovery in this case futile, and therefore, stands as a bar against recovery. This conclusion is a *non sequitur.* Mere temporary impossibility of disbursement to the beneficiaries does not operate to prevent recovery by the administrator.

The clear weight of authority, therefore, is against the ruling asked for by the defendant. We do not feel warranted in adopting the minor and vanishing doctrine. Moreover, the defenses that there are no persons in existence legally capable of taking the benefits of the recovery, and that the presidential proclamation operated to bar the action, were not pleaded. Even if valid, these defenses were affirmative and observance of the strict rules of pleading would require special pleas to assert them. See *Wilder* v. *Charleston Transit Co.,* 120 W. Va. 319, 197 S. E. 814, 117 A. L. R. 948

No other error of law is assigned for the setting aside of the verdict. The action was based solely on the insufficiency of the evidence. Our whole duty here, therefore, is to appraise that evidence and to test its sufficiency as a basis for recovery by the plaintiff.

The accident which caused the decedent's death occurred April 14, 1938, about 11:00 P. M., on a public highway on Cabin Creek in Kanawha County. This creek flows substantially north in a narrow valley or gorge with hills or mountains on either side. The road at the point of the accident was straight and level and improved

with a concrete surface sixteen feet wide. It ran between the creek on the west and a railroad on the east with space enough between it and the railroad, for the erection of certain buildings.

The maps filed in evidence show the highway for a distance of about two hundred and fifty feet north of the point of accident. At the north end of the map the road is seen to begin a curve to the west, which is described by various witnesses as being "sharp" or "stiff". At the south end of the curve is located, on the east side, a building called in the record "Mother Blizzard's Place". About one hundred and seventy feet south of this building is another designated "Billo's Place". Further south, at a distance of about one hundred and twenty feet from Billo's Place, is a building spoken of as both a shed and a garage, immediately beyond which is an unimproved driveway leading from the highway across the railroad. There are no buildings on the west side of the highway except Braden's Garage, which is about twenty feet beyond the driveway above mentioned. Billo's Place stands back from the pavement about twelve feet and the shed or garage at the driveway somewhat farther. There is a "berm" or shoulder between the pavement and the buildings, on the east side, on which either two or three cars were parked. Opposite the south end of Billo's Place, on the west side of the highway, is a wider space, surfaced with gravel or "rip-rap", called in the record a parking space, which extends along the highway for a distance of eighty or one hundred feet.

The evidence shows that the decedent and one Walter Litteral had spent a large part of the afternoon of April 14th together in and about their homes at the village of Acme, which is about four miles south of the place of the accident. About six-thirty P. M., these two and two other men, named Jarrell and Palmer, were driven by Litteral's wife to the town of Eskdale, which is about one mile north of the point where the accident occurred. There the men spent about two hours in an establishment known as "Jimmy Palmer's Place", which is a combination restaurant and soft drink and beer stand, with a dance

hall in connection. Mrs. Litteral remained outside in the car, except for a few minutes during which time she returned home and brought back her three children, aged, respectively, eleven, seven and one and a half years. Coming from the Palmer Place, the four men were driven in the car by Mrs. Litteral to Mother Blizzard's Place which they entered, staying only fifteen or twenty minutes, after which Litteral and the decedent came to the car and were driven to Billo's Place, the other two men going there on foot. The decedent and Litteral remained at Billo's for two hours or more, Mrs. Litteral and the three children remaining in the car, which was standing on the parking space above mentioned. Either two or three times Mrs. Litteral sent her eleven-year-old daughter into Billo's Place to urge her husband to come home. The decedent met his death immediately after leaving Billo's Place as he, with Litteral holding his arm, was attempting to cross the highway to the Litteral car.

The plaintiff's theory of the case is that the decedent and his companion, Walter Litteral, came out of the building, and, in attempting to cross the highway to the latter's car, which is said to have been standing opposite the south end of the Billo building, had taken about one step onto the pavement when the defendant's car arrived at a speed estimated at from fifty to seventy miles an hour, on its extreme left side of the road, without lessening its speed, struck the decedent, carrying his body to the driveway leading to the railroad, a distance of one hundred and twenty-five feet, and then turned to its own right and came to a stop south of Braden's Garage at a point about two hundred feet from the point of the accident. To maintain his case, the plaintiff introduced Litteral and his wife and their two children, age seven and eleven years, respectively, at the time of the accident. The finding of the decedent's hat on the pavement about three feet from its left edge and about thirty feet south of Billo's Place and the appearance of blood on the left side of the road further on are relied upon as corroboration.

The defendant's version of the accident is that he was returning from Eskdale, where he had attended a lodge

meeting, with four companions in his 1938 Ford Sedan, driving wholly on the right half of the pavement, at a speed of about thirty miles an hour, with his horn repeatedly sounding; that after he had passed Billo's Place, two men suddenly appeared ahead, at a distance of about thirty feet, as if about to cross in front of his car, whereupon he blew his horn and applied his brakes; that one of the men stepped back, but decedent plunging forward directly in front of the car, was struck, his body falling back against the windshield directly in front of the defendant's face, and causing him to lose control of the car temporarily and to let it swerve sharply to the left; that the decedent was struck at a point about sixty feet above Billo's Place and that his body was carried to, and dropped at, the driveway crossing as the car was turning back to the right; that the car was stopped on the right half of the pavement about thirty feet beyond the crossing from which point it was driven onto the berm beyond Braden's Garage by Smith Jackson, a mechanic of the garage. In this version of the event, he is corroborated by the four men in his car, by Jackson, who says he moved the car, as stated by the defendant, by Mrs. Billo, who testified as to the speed of the car and the side of the road on which it passed her place, and by the finding of broken glass, part of which is identified by a state policeman as having come from the left headlight of the defendant's car, at the point where the defendant says the decedent was struck, the glass being mostly on the right half of the pavement.

The plaintiff's witnesses are attacked as unreliable. Irene Litteral, eleven years of age at the time of the accident and thirteen at the time of the trial, says that as her father and the decedent stepped "about two inches" onto the hard surface, the car came around the curve on the left side of the road, at which time her mother called to her father to "watch out" for the car, and that when the decedent was struck she was so scared she does not remember anything thereafter. Walter Litteral, Jr., seven years of age at the time of the accident, says that the "car just swerved onto the left side and hit Mr. Burgess;"

that Mr. Burgess and his father were standing so that "their shoes were touching the tip of the road", that he heard no horn, and that his mother called to his father and the decedent to watch out as the car came around the curve.

Mrs. Litteral says that the defendant's car was traveling sixty or seventy miles per hour on the left side of the road; that no horn was sounded until at the moment of the collision, and that brakes were not applied so far as she could tell; that after the accident, she and her husband went to the body of Burgess, but that, when others arrived, the Litteral family hastened home on account of the hysterical condition of the daughter. But before a justice of the peace immediately after the accident, she stated, according to a private stenographer's notes, that she "couldn't say how fast he was going because I don't know", and that "it seemed like he tooted the horn real quick and I saw my husband jump back and Mr. Burgess, it looked like it excited him and he jumped towards the car"; that "when he blowed the horn he jumped toward the center of the road", and "into the path of the car Mr. Gilchrist was driving."

Walter Litteral says that he and Burgess, who was about fifty-two or fifty-three years of age and in good health, came out of Billo's Place to the road, "went up a piece and started across"; that his wife called to him to "watch out" for the defendant's car; that they had taken one step onto the pavement when the car approached on the left side at fifty or sixty miles an hour; that he saw it between two and three hundred yards away, and that he told Burgess "to be careful, there comes a car"; that he heard the horn just as Burgess was struck, but that he heard no brakes; that Burgess was on his right and was hit and thrown against the witness, knocking him down; that Burgess' body was found at the crossing about one hundred and fifty feet from where he was struck, the car going on for a total distance of approximately two hundred feet from the place of the accident; that Burgess' hat was found three feet in from the east, or defendant's left, side of the pavement, and about thirty feet south of

Billo's. This witness was also confronted with the stenographer's notes of his testimony before the justice of the peace. These notes show that he there swore that the accident occurred, not at Billo's but at Blizzard's Place, and that he denied there that his daughter had been sent to ask him to come home; that he further swore that his family went directly home from Blizzard's Place after the accident without ever having been in Billo's Place; that he and Burgess had taken two steps, not one, onto the road and that he was on the right of the decedent, and not on his left, as he now states. Other minor discrepancies, perhaps not important, are noted.

In explanation of these discrepancies in the testimony of Litteral, the defendant's counsel argue that at the time of the accident he was too drunk to know what was going on. He admits he had been drinking some beer during the afternoon and evening, and witnesses testified to his drinking beer at Palmer's and at Blizzard's. His daughter says he was not drinking. The son says he had been drinking "a little bit". His wife says he was "jolly", but "not what you would call drunk." Earnest Palmer, a witness for the plaintiff, says that Jarrell, one of the group of four, was drunk and that they were all in about the same condition; Charlie Harmon, also plaintiff's witness, says that Litteral was "pretty much in the air", but would not say whether he was "too drunk" to have given attention to Burgess. Jess Gardner, who was in the defendant's car, and who testified for him, says that both men were staggering as they came onto the road; and Mrs. Billo, the operator of Billo's Place, says that Litteral was "beastly drunk." From this evidence, we can see no alternative, but to conclude that Walter Litteral was in such a state of intoxication at the time of the accident, as to make his testimony of little value, a conclusion which is confirmed by the serious discrepancies between his testimony at the present trial and that given by him before the justice a few days after the accident. The testimony of Mrs. Litteral is better, yet she says that the "place was dark to me" for a moment after the accident. We are, therefore, not certain that it is possible for her

to recall clearly the details which she gives with substantial variations before the justice and on this trial. The children, who disagree with their mother as to whether they were in the front or rear seat of the car, and who respectively testified that the decedent's feet were "two inches" on, "just touching," the pavement, evince distinctly their inability to distinguish between what they recollected and what they imagined. This total evidence, while a feeble basis for a verdict, was probably enough to carry the case to the jury.

The witnesses for the defendant are also criticized. The appearance of "tracking" is charged against them, and possibly is not entirely explained away; but if they had not agreed, they would doubtless have been charged with contradiction among themselves, which would have been a more serious matter. Of more substance, however, is the argument that the defendant and his own witnesses show him to have been guilty of negligence proximately causing the decedent's death. It is said that his driving on the road at thirty miles an hour where he knew pedestrians were so likely to be in such danger that the blowing of his horn continuously was necessary, and his failure to see the decedent until within thirty feet of him, show lack of proper care. However, we cannot say that a speed of thirty miles an hour on a straight and level road under the surroundings of this case was excessive, nor that the recognition of the necessity of blowing the horn repeatedly showed a necessity for reducing speed below thirty miles, nor that other precautions should have been taken. Failure to appreciate the decedent's peril is not more culpable. The discovery of two men on the left side of the highway at a safe distance cannot reasonably be considered as a warning that one of them would plunge in front of the car as it passed. Moreover, the car could be seen for a distance of at least two or three hundred feet (called by Litteral two or three hundred yards), and the decedent was expressly warned by his companion, Litteral, of the approach of the car, while there is also the high probability that he heard Mrs. Litteral's warning to her husband. The defendant's fail-

ure to see the victim sooner is very humanly explained by him when he says that, if he did see him, "it just didn't register". The decedent and his companion had the appearance of ordinary pedestrians standing at a safe distance who required no special precautions. The evidence shows the decedent was accustomed to drink at times, and that he was the companion, during all the afternoon and evening, of Litteral, who was undoubtedly intoxicated. Several witnesses say that the decedent showed marked signs of intoxication. This probably accounts for his "plunge" in front of the fatal car, an act which the defendant could not have anticipated.

A fair appraisal of the record, therefore, leads inevitably to the conclusion that the verdict was against a clear preponderance of the evidence. The considerations which gave the trial judge pause and led the circuit court to grant a new trial to the defendant, prevail with us, and impel us to agree with the latter court. But the plaintiff says in the brief here: "The jury is the sole judge of the weight and effect of the evidence and of the credibility of the witnesses who testified in the case," and to sustain this doctrine we are cited to *Fielder* v. *Service Cab Co.,* 122 W. Va. 522, 11 S. E. 2d 115; *Morton* v. *Baber,* 118 W. Va. 457, 190 S. E. 767; *Cline* v. *Christie,* 117 W. Va. 192, 184 S. E. 854; *Dye* v. *Rathbone,* 102 W. Va. 386, 135 S. E. 274; *Charleston* v. *De Hainaut,* 95 W. Va. 202, 120 S. E. 524; *Wingo Mining Co.* v. *Flanagan Coal Sales Co.,* 93 W. Va. 76, 115 S. E. 839; *Nesben* v. *Jackson,* 89 W. Va. 470, 109 S. E. 489; and *Keenan* v. *Donohoe,* 70 W. Va. 600, 74 S. E. 859. Of this proposition it is sufficient to say that, if it is the law, it is not the whole law. When fully stated, the principle, like most legal abstractions, embodies universally recognized qualifications and exceptions. The jury's right to be "sole judge" of the matters mentioned does not exist where their judgment is against the plain and decided preponderance of the evidence, and the question whether this preponderance exists rests finally with the court. This judgment of the court, litigants have the right to invoke, and the performance of this duty neither trial nor appellate court may timidly or indolently evade.

Regarding the authority of a court to set aside a verdict which, in its judgment, is "against the clear preponderance of the evidence", there can be no question. *Huntington Development & Gas Co.* v. *Topping*, 115 W. Va. 364, 176 S. E. 424; *Woodley* v. *Steiner*, 112 W. Va. 356, 164 S. E. 294; *Armour Fertilizer Works* v. *Finnell*, 112 W. Va. 325, 164 S. E. 253; *Cannady* v. *Chestonia*, 106 W. Va. 254, 145 S. E. 390; *McKown* v. *Citizens' State Bank*, 91 W. Va. 716 114 S. E. 271; *Palmer* v. *Magers*, 85 W. Va. 415, 102 S. E. 100; *Coalmer* v. *Barrett*, 61 W. Va. 237, 56 S. E. 385; *Distilling Co.* v. *Bauer*, 56 W. Va. 249, 49 S. E. 160; *Limer* v. *Traders Co.*, 44 W. Va. 175, 28 S E. 730.

The action of the Circuit Court of Kanawha County in reversing the judgment of the Court of Common Pleas of that county, setting aside the verdict of the jury and awarding the defendant herein a new trial is affirmed.

*Affirmed.*