**VON MOLTKE v. GILLIES.**

**No. 10307.**

Circuit Court of Appeals, Sixth Circuit.

March 10, 1947.

Writ of Certiorari Granted June 2, 1947.

See 67 S.Ct. 1517.

McALLISTER, Circuit Judge, dissenting.

G. Leslie Field, of Detroit, Mich., for appellant.

Vincent Fordell, of Detroit, Mich. (John C. Lehr and Vincent Fordell, both of Detroit, Mich., on the brief), for appellee.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

The appellant's petition for writ of habeas corpus, after full hearing by the District Court, was denied, and this appeal was instituted. The case arises out of the following facts:

The appellant, together with 23 others, was indicted for conspiracy with each other and with the German Reich to violate § 32, Title 50 U.S.C., 50 U.S.C.A. § 32.

On September 21, 1943, the appellant was arraigned, and under advice of counsel appointed at that time by the court, she stood mute and a plea of not guilty was entered. On October 7, 1943, appellant waived her right to be represented by counsel and changed her plea of not guilty to guilty. The record presents a written waiver, which reads as follows:

"I Marianna von Moltke, being the defendant in the above entitled cause, having been advised by the Court of my right to be represented by counsel, and having been asked by the Court whether I desire counsel to be assigned by the Court, do hereby, in open court, voluntarily waive and relinquish my right to be represented by counsel at the trial of this cause."

On August 7, 1944, the appellant filed a motion for leave to withdraw her plea of guilty on the ground that it was made "under circumstances of extreme emotional stress and during a time of extreme mental disturbance, without knowledge of her legal rights and without a thorough understanding of the nature of the offense charged. * * *" The motion was denied, on the ground that the appellant thoroughly understood the nature of the charge and changed her plea after due deliberation, and also because the motion was not filed within the period fixed by Rule 2(4) of the Rules of Criminal Procedure for withdrawal of pleas of guilty. The appellant then filed a petition for a writ of habe-

as corpus, which was dismissed by the District Court upon substantially the same grounds.

A majority of the court holds that the judgment is valid and that the application for a writ of habeas corpus was rightly denied. The appellant was unquestionably under mental stress, which would be the case as to countless defendants accused of felony. The record shows, however, that she is extremely intelligent. She came to this country from Germany in 1927, has resided in Detroit since 1930, and for a foreign-born person she exhibits a remarkable command of the English language.

Appellant states that she read the indictment. She contends that she did not understand it; but the attorney appointed by the court to represent her at the time of the arraignment, who certainly is a disinterested witness, testified that she and her companion, Mrs. Leonhardt, also indicted under the same charge, led him to believe that they understood. He stated: "Well, I asked both of them, that is, both at once, whether they understood what this was all about. I believe that is quite similar to the language I used. And one or the other of them said, yes, they did understand, and the other indicated that she, too, understood. And then I asked if they felt that they were guilty or not guilty, and both indicated that they felt they were not guilty. I then rather hurriedly explained to them the advantage of standing mute as against pleading not guilty at that moment, and it was agreed that they would both be stood mute." Later the attorney reiterated that "they both indicated their understanding," and both indicated that they were innocent. Subsequently, upon September 25, 1943, appellant was questioned at length about the indictment by two attorneys sent by her husband. These attorneys informed appellant that they would not represent nor advise her. However, they were with her two and a half hours, and the testimony of one of them is as follows:

"Q. Your purpose was to discuss this case with her? A. That is right.

"Q. And you did discuss this case with her? A. That is right.

"Q. You read the indictment at that time? A. Yes, I did; yes.

"Q. Did you read it to her, to Mrs. von Moltke? A. I read parts of it. There were certain—she stated her story, and then I wanted to—well, it was a form of cross-examination. There were certain charges in the indictment, and I said, well, how about this? and then she gave me her answer to that.

"Q. You examined her insofar as the indictment affected her? A. Yes, sir.

"Q. So you covered the charges that were more or less directed toward her? A. Not—I may have, but not fully. I just picked up as I glanced through it. It was quite lengthy. And I glanced through it, and as I found something in there that pertained to her that I thought might be embarrassing to answer, I presented it to her to see what she had to say, and she gave me an answer.

\* \* \* \* \* \*

"Q. But she did protest her innocence of the charges contained in the indictment? A. That is correct.

"Q. So part of the time that you spent with her was devoted to the discussion of this case? A. Well, it was all around the case, and the incidental phases of the case."

The second attorney did not testify in the case, due to illness. It is uncontradicted that these lawyers told appellant if she was guilty, to plead guilty, and if not, not to do so.

Appellant's own testimony contradicts her statement that she did not understand the charge. On cross-examination she testified as follows:

"Q. Mrs. von Moltke, when you were served with the indictment in this case, did you read it? A. I read it.

"Q. And after you had read the indictment, did you feel you were innocent of the charges that were stated in the indictment? A. Yes, sir, definitely so.

"Q. You did not feel you were guilty of those charges that you read in the indictment? A. I did not feel guilty of those charges in the indictment.

"Q. Then you knew what the charges were in the indictment. A. Oh, no, and so far I might explain that to you, I knew—

"Q. Just answer my question.

"The Court: Answer the question.

"A. Yes, I knew, not what the charges were but I knew as I said before that I saw I was accused of something of which I was not guilty. That was how I understood that.

"Q. Well, you read the indictment. Isn't that right? A. I read the indictment.

"Q. And you felt you were innocent of the charges that were described in that indictment? A. And the overt acts.

"Q. And the overt acts? A. Yes.

"Q. Do you recall how many overt acts you read in that indictment, approximately? A. Five.

"Q. Now, after you talked to Mr. Collard, did you still feel you were innocent of those charges? A. Yes, sir, because I told Mr. Collard so.

\*　\*　\*　\*　\*　\*

"Q. Regardless of what Mr. Collard told you, you still felt you were innocent of the charges in the indictment? A. Yes, sir."

Appellant saw her husband twice a week between the time of arraignment, September 21, 1943, and October 7, 1943, when she withdrew her plea. He had a Ph.D. degree, and, as appellant said, "a certain amount of education in German law." He repeatedly advised appellant not to change her plea, and told her to get a lawyer. She says that she did not know she was entitled to a lawyer; but on the other hand, she stated that Judge Moinet informed her that she was entitled to counsel. Officials of the F. B. I. told her the change of plea was a question for her or her attorney. They also told her that she should in no case plead guilty unless she was guilty. The appellant admits that no promises or threats were made to her. She stated on several occasions that she did not wish to consult a lawyer, but desired to settle the matter herself. On her own initiative she sent the chief assistant district attorney, through an F. B. I. agent, a proposition to plead guilty to the indictment if the district attorney's office would agree to certain conditions: (1) that she be not deported; (2) that she be sent to some penitentiary near Detroit, and (3) that the newspaper publicity be stopped, because her husband had been an instructor at Wayne University. The assistant district attorney stated that he had no control over such matters, and could make no such agreement, but would recommend that if she pleaded guilty she be imprisoned near Detroit. When this was communicated to the appellant she indicated that she still desired to plead guilty.

When the appellant appeared in court to change her plea, the judge said he could not accept the change of plea because an attorney should be present. The case is sharply differentiated from De Meerleer v. People of State of Michigan, 67 S.Ct. 596, 597. There "At no time was assistance of counsel offered or mentioned" to the seventeen year old defendant. Here the trial court proceeded on the application for change of plea to protect appellant's rights with meticulous care. Although it was explained that appellant desired to change her plea, the judge was not satisfied with reference to the question of the attorney. Appellant had already been informed by one judge that she was entitled to an attorney appointed by the court, and now a second judge put the specific question to her, whether she was represented by counsel, whether she wished counsel assigned by the court, and she said no. The judge inquired whether the plea was made on the suggestion of any Government agent, and appellant said no. He asked whether any threats or promises had been made to her, and she said no. He inquired whether the indictment had been explained to her, and she admits that she said yes. Her testimony in the habeas corpus proceeding, with reference to change of plea, continues as follows:

"Q. Now, then, I ask you, had it been explained to you? A. No, it had not been fully explained to me.

"The Court: Well, you read it, didn't you? You seemed to remember about various paragraphs that cover the Overt Acts, and described them as 'Overt' Acts. You had read it, had you not? The Witness: I had, your Honor.

"Q. Was there any further conversation between you and the Court? A. Judge Lederle said, 'And you plead guilty

because you feel you are guilty?' and I said, 'Yes.'

"Q. At the time you gave that answer, was it true that you were pleading guilty because you knew you were guilty? A. It was not, because I pled guilty to cooperate."

■■ The burden was on the appellant to establish as a matter of fact that she did not competently and intelligently waive the right to have assistance of counsel and that she did not understand what she was doing when she changed her plea. The trial court, who saw the witnesses, held that appellant did not sustain this burden, and a majority of this court agrees with that conclusion. We think the testimony quoted shows that appellant understood the charge, that she understood the consequences of pleading guilty, and that she waived the right to have counsel after long and deliberate consideration and full understanding that an attorney would be appointed for her without charge, if she desired, and with a complete understanding of what this attorney could do for her.

■ It is not the law that an accused cannot enter a valid plea of guilty without the assistance of counsel. As stated by the Supreme Court in Adams v. United States, 317 U.S. 269, 275, 63 S.Ct. 236, 240, 87 L. Ed. 268, 143 A.L.R. 435: "The short of the matter is that an accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury, and so likewise may he competently and intelligently waive his Constitutional right to assistance of counsel. There is nothing in the Constitution to prevent an accused from choosing to have his fate tried before a judge without a jury even though, in deciding what is best for himself, he follows the guidance of his own wisdom and not that of a lawyer."

■ Also the motion to withdraw the plea was filed far too late, having been filed some ten months after appellant pleaded guilty. While the motion was made before sentence, it was not within the ten-day period fixed by Rule 2(4) of the Rules of Procedure for Pleas of Guilty, 18 U.S.C. following § 688.

The harshness of the ten-day rule is emphasized by appellant's counsel, who urge that appellant has a diabetic child, and necessarily was under great emotional disturbance during the period between arraignment and plea of guilty. A situation equally grave was presented in Swift v. United States, 79 U.S.App.D.C. 387, 148 F.2d 361, in which an appellant who had been advised that the strain of the trial would endanger her life, pleaded guilty to three indictments. A year after imposition of sentence she filed a motion to be permitted to change her plea. Her motion was supported by a physician's affidavit describing appellant as "suffering 'from one of the most dangerous heart conditions.'" The court held, notwithstanding, that the trial court was without jurisdiction to grant the motion.

■ To the same effect are Hood v. United States, 8 Cir., 152 F.2d 431, 435, and United States v. Achtner, 2 Cir., 144 F.2d 49. The latter decision declared that while this rule may be too harsh, it is the law applicable to cases of this kind. The rule has now been changed [Rule 32(d) of Rules of Criminal Procedure, effective March 21, 1946, 18 U.S.C.A. following section 688], but in its old form it is controlling here.

The judgment and sentence are valid, and the judgment of the District Court is affirmed.

McALLISTER, Circuit Judge (dissenting).

On August 24, 1943, between 6 and 7 o'clock in the morning, six men came to the home of Marianna von Moltke, Appellant, in Detroit, Michigan. They were agents of the Federal Bureau of Investigation of the Department of Justice. Appellant's husband admitted them to the house, and they immediately went to her bed-room. She was in bed. One of the men thereupon arrested her and ordered her to go into the living room, which she did. She then dressed. The agent who ordered her to go into the living room had a presidential warrant for her arrest as a dangerous enemy alien. The various other agents asked permission of the husband to search

the house, and were given such permission. Mrs. von Moltke was then taken by the government agents to the offices of the Federal Bureau of Investigation in the Federal Building, at Detroit. She was fingerprinted, photographed, and examined by a physician. She was then subjected to questioning by two agents of the Federal Bureau of Investigation from 10 o'clock in the morning until 8 or 9 o'clock at night. This questioning lasted for four consecutive days. During that time she was locked in a room and not allowed to see, or speak with, anyone except government agents. At the end of the fifth day of such imprisonment, she was released from the locked room and incarcerated in the Wayne County jail. During these five days she had not been allowed to see, or speak with, her husband, or anyone else.

Mrs. von Moltke came with her husband to the United States from Germany in 1926. Her passport discloses her title to have been Grafin, or Countess, but she has never used that title in this country. Her husband Heinrich von Moltke was educated in Germany before the First World War, and obtained a degree of Doctor of Philosophy. He became a naturalized citizen of the United States in 1937. Mrs. von Moltke's application for citizenship was pending at the time of her arrest. Heinrich von Moltke had been employed as an instructor in the German language at Wayne University, in Detroit, at a salary of $4,000 a year. Upon her arrest, he was immediately discharged from his position. He later got a job that paid him $35 a week. No accusations have ever been made against him. Mrs. von Moltke at the time of her arrest was living with her husband and two of her children. The youngest child was then nine years of age, and suffered from diabetes. He needed constant supervision and attention. He required two injections of insulin each day, and a strict diet. She had to take care of the child constantly. Because of these circumstances she was under great nervous tension. After the second day of her arrest one of the government's agents secured permission to call her husband and related to her what her husband said about the child. Afterward, Mr. von Moltke placed the child with some of their friends, but they subsequently did not want to care for him, and he had to be placed with others. Mrs. von Moltke's social activities were limited to working for the Red Cross, membership in the Parent-Teachers Association, and volunteer social work with the Y. W. C. A. She had also engaged as a volunteer in the work of gas and sugar rationing for the government.

On September 1, 1943 Mrs. von Moltke was taken before an Enemy Alien Hearing Board. Up to this time she did not know why she was being detained; no charges had been made against her, and she had not been allowed to see an attorney. She was told that as an enemy alien she was not allowed to have legal counsel. Later, on September 18, the matron at the County Jail gave her a copy of an indictment against her. This indictment was for conspiracy to violate the Espionage Act, 50 U.S.C.A. § 31 et seq.

On September 21, she was taken before the District Court, to plead to the indictment. She had no counsel, and had discussed the charges with no lawyer. The District Judge, finding that she was not represented by counsel, stated that she was entitled to legal assistance, and would have to have a lawyer to represent her. He then called some young attorney from a group sitting in the court room and told him to represent her. The lawyer objected, and stated that he did not want anything to do with the case. The District Judge then assured him that it would be only for the arraignment. Upon this assurance, and without seeing the indictment or discussing it with Mrs. von Moltke, the attorney had a short whispered conversation with her and told her that if she felt she was not guilty, it was advisable to stand mute. She agreed to do so, and the attorney then informed the court that the prisoner was standing mute. A plea of not guilty was entered. The District Judge then stated that he would appoint an attorney for her right away, and she was taken back to the County Jail. No attorney came to see the Appellant, and no attorney was thereafter appointed for her.

The jail matron, upon Appellant's return to her cell, informed her that she had strict

orders to keep her incommunicado. However, agents of the Federal Bureau of Investigation talked with her daily from then on until October 7. During that time Appellant was greatly worried about the possibility of being attacked by persons on her way to court, "to face a hostile public." She inquired of one of the agents of the Federal Bureau of Investigation: "Is it really so bad, that the public is so hostile? * * * If we go to Court, will we be bodily attacked?" She was told by the agent: "It is war time—you have to bear that in mind. Public sentiment grows from war hysteria. You don't need to be afraid; you will be protected." However, she testified: "But they left me with the thought that it is terrible to go to court and face a hostile public." Moreover, she had been told by one of the other prisoners, that unless she pleaded guilty, her husband would be involved and implicated in the criminal proceedings. She asked one of the agents whether that would be the case, and he told her that he could not answer that question.

Two lawyers called upon her at the jail during this period. They had been sent by Appellant's husband to talk to her, but they had not been retained as counsel. In fact, they told her that nothing she said would be held in confidence by them; and they afterwards advised her husband that they could not be connected with the case. At no time did they discuss her legal rights or advise her as to any course of action, or possible legal defenses, or explain the charges made against her. Mrs. von Moltke repeatedly asked the agents of the Department of Justice for advice as to whether she should plead guilty or not.

Later on Mrs. von Moltke had a talk with agent Collard of the Federal Bureau of Investigation. He told her that he was also a lawyer, and that he had been admitted to practice. He was the same agent who had arrested her, and who had interrogated her during the four days following her arrest. Mrs. von Moltke appealed to him to explain the indictment to her; and he consented not only to explain the indictment, but to advise her of the meaning of conspiracy. For this purpose, the matron at the jail gave them an office. The agent's explanation of the indictment and of the meaning of conspiracy lasted for several hours.

In dissenting from the views expressed in the accompanying opinion, I consider this interview and the agent's explanation to be the crucial and decisive feature of the case.

Mrs. von Moltke told the agent that she had never done any of "those things" that were designated as overt acts. "Mr. Collard explained to me that the 'Overt' Acts in the indictment do not mean the real thing. * * * Mr. Collard explained to me that the indictment doesn't cover the charge, and I seemed not to be able to understand, so Mr. Collard explained the indictment to me by an example, which he called the 'Rum Runners.' * * * That if there is a group of people in a 'Rum' plan who violate the law, and another person is there and the person doesn't know the people who are planning the violation and doesn't know what is going on, but still it seemed after two years this plan is carried out, in the law the man who was present becomes * * * the person is guilty of conspiracy. And I said to Mr. Collard: 'If that is the law in the United States I don't know how I ever can prove myself innocent, and how will any judge know how am I guilty if this is the law?' * * * Then I said: 'How will any judge know how to judge me like that, if one is innocent and the law is such and such?' And Mr. Collard told me about the Probation Department. * * * He explained to me that it is the duty of this office—the Probation Department—to collect the proper data and present it to the judge, so that the judge will know what to go by."

All of the foregoing testimony of Mrs. von Moltke on the hearing is undisputed. Mr. Collard was a witness, and on this phase of the case he testified as follows:

"Q. Did you try to explain it (the indictment) to her? A. Yes, as I remember, I did. * * *

"Q. Well, in explaining the indictment to her, what explanation did you give her? A. I just tried to explain it the best I could. * * *

"Q. Did you explain to Mrs. von Moltke the nature of a conspiracy? A. I attempted to, yes.

"Q. To the best of your ability? A. Yes, sir.

"Q. And did you spend some time on that particular phase of your explanation? A. I do not recall, but we probably did.

"Q. And did you during that discussion use an illustration about a rum runner? A. Well, I heard Mrs. von Moltke say that, and since she did I have been trying to recall, and I cannot remember such an illustration.

"Q. I see. A. But it is quite possible that Mrs. von Moltke's memory is better than mine, and I may have used such an illustration. * * *

"Q. Did you in any way explain, or attempt to explain to Mrs. von Moltke the meaning of the word 'feloniously'? A. I cannot remember her asking that, but if she did ask me, I probably tried to explain it to her; but whether that was one of them, I just don't remember. * * *

"Q. And did you explain to Mrs. von Moltke the nature of an overt act? A. Well, if she asked me, I probably tried to, but whether she asked me or not I just don't remember.

"Q. And did Mrs. von Moltke ask you whether merely conferring with people who later turned out to be guilty of criminal acts would also make her a criminal, and guilty of criminal acts? A. I do not just recall that particular question. It is quite possible."

From the record and the transcript of testimony we are constrained to conclude that Mr. Collard advised Mrs. von Moltke as to the indictment and the legal meaning of conspiracy, as she testifies. However, it can be said that Mr. Collard's obvious honesty and integrity in the matter is most commendable. Although he was mistaken in his advice to Mrs. von Moltke, he manfully declined, on the witness stand, any opportunity to shade, obscure, or to deny that he did give her such advice, either to excuse himself, or to defeat her contentions; and his conduct in this respect as an investigatory and law enforcement official of one of the most distinguished branches of our government, is highly honorable, exemplary and worthy of praise.

Some days after her interview with Mr. Collard, Mrs. von Moltke decided to plead guilty, without consulting any lawyers other than the government agent. This action was directly contrary to the advice and wishes of her husband. She was taken before the District Court; she then withdrew her plea of not guilty, and entered a plea of guilty. The court asked her if she wished counsel, and she said that she did not. He further asked her if she was pleading guilty because she was guilty, and she answered in the affirmative. She signed a waiver of counsel, reciting that she had been advised by the court of her right to be represented, and had been asked whether she wished to have counsel assigned to her, but that she had voluntarily in open court waived and relinquished the right to be represented by counsel on the trial. She was then remanded to jail to await sentence.

Some months later, before sentence, she was advised that,· in a criminal case, the accused was presumed to be innocent, and that if she had gone to trial, she would not have been obliged to prove herself innocent of the charges against her. She testified:

"I learned that in the United States, under the constitution, as a defendant you do not have to prove yourself innocent as in the European countries; that it is the task of the prosecuting attorney to prove you guilty. * * *

"I first found that out on January—Monday, January '7, from Mr. Dunham (an agent of the Federal Bureau of Investigation). Mr. Dunham came up and we had a conversation on that. Mr. Dunham said it is true that in the United States, under the constitution, nobody is guilty until he has been proven guilty. That was the first time that I talked to Mr. Dunham about it. I asked again for Mr. Collard, to inform me whether this is my right; whether people who plead guilty are permitted in America to withdraw their plea. This was on January 6. After this we had several conversations. Mr. Dunham, on January 17, answered my question by say-

ing that under the American constitution nobody is guilty until he has been proven guilty."

Color is given Mrs. von Moltke's contention in this regard, by reason of the fact that Agent Dunham was called by the government as a witness on the hearing on Appellant's petition, and he denied none of the foregoing statements.

Legal counsel thereafter retained for her then moved to withdraw her plea of guilty. This was denied by the District Court November 14, 1944, and on the same date, more than thirteen months after the entry of her plea of guilty, she was sentenced to imprisonment for a term of four years.

The undisputed evidence from the hearing before the District Court on Appellant's petition for a writ of habeas corpus clearly substantiates her claim that the chief reason why she pleaded guilty was because of the legal advice given her by an agent of the United States government. This advice, from a man who was a lawyer, was, though honestly given, false. Believing that the information she received was true, and unquestioningly trusting in the honesty and integrity of the agent, Appellant was convinced that if it were proved that she had merely been present when acts of conspiracy, of which she had no guilty knowledge, were carried on, under the law, as explained to her, she would be equally guilty with the conspirators, and that she would have the burden of proving her innocence on a trial.

The indictment in its allegations of Appellant's participation in the conspiracy was in general terms. Out of 47 Overt Acts charged, Appellant was named in five, as follows: "In pursuance of said conspiracy and to effect the object thereof" she "met and conferred with" a certain woman on two occasions, and with the same woman and another on one occasion, and with these two and a third woman on another occasion; and that she introduced one Arndt to the first named woman on another occasion.

On the hearing of her petition for a writ of habeas corpus before the District Court, in response to questions by the trial judge, she unqualifiedly denied all knowledge of any conspiracy against the government, all charges that she had ever introduced an individual to an enemy agent as charged, or any knowledge that the woman whom she was accused of meeting with, was an enemy agent; and no proof was introduced by government counsel to the contrary.

The contentions that Appellant freely, intelligently, and knowingly waived her constitutional right to have the assistance of counsel in her defense, as guaranteed by the Sixth Amendment, and the contention that she was deceived by a government representative into pleading guilty and thus deprived of her liberty without due process of law, contrary to the guarantee of the Fifth Amendment, are inextricably bound together.

We can only conclude from the record before us that it was the false information and legal counsel given to her by the government agent as to what the charge of conspiracy embraced, and what the law of conspiracy provided, that induced appellant to plead guilty. She relied upon this counsel, as coming from a lawyer, in whom she had confidence. Her waiver to the right of legal assistance arose out of her reliance upon such advice. If that advice had been correct, there would have been no presumption of innocence entertained on her behalf on the trial, and she would have had little chance, if any, to escape conviction. Prior to her sentence, she had never been advised as to her rights and as to the charges against her, except by the government agent. From the undisputed evidence in the record before us, I am of the opinion that Appellant clearly sustained the burden of establishing before the District Court that she did not competently and intelligently waive her right to counsel, and, that she pleaded guilty because of the erroneous and false advice given to her, innocently enough, by the government representative. See Waley v. Johnson, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302; Walker v. Johnson, 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830.

It is true, as stated in the accompanying opinion, that Appellant's previous petition to withdraw her plea of guilty was filed too.

late to permit of its consideration by the District Court, because of Rule 2(4) of the Rules of Procedure for Pleas of Guilty, then in effect and which has since been changed. Rule 32(d) of the Rules of Criminal Procedure, effective March 21, 1946. But we are here concerned not with the determination of Appellant's right to withdraw her plea of guilty, but with the allowance of her petition for a writ of habeas corpus, based upon denial of her constitutional rights.

In accordance with the foregoing a judgment should be entered setting aside the judgment heretofore rendered. The writ of habeas corpus should be granted and the Appellant remanded to the District Court for trial, on a plea of not guilty. 28 U.S.C. A. § 461; Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461.