**VON MOLTKE v. UNITED STATES et al.**
No. 11059.

United States Court of Appeals
Sixth Circuit.
April 6, 1951.

Wilbur V. Keegan, Detroit, Mich. (Wilbur V. Keegan, Detroit, Mich., on the brief), for appellant.

Vincent Fordell, Detroit, Mich. (Edward T. Kane and Vincent Fordell, Detroit, Mich., on the brief), for appellee.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The petitioner appeals from an order of the District Court dismissing her petition for writ of habeas corpus and discharging the writ. This is the second appeal.

The facts giving rise to the proceeding are fully stated in the majority and dissenting opinions of this Court [161 F.2d 113 and 117] on the first appeal, wherein the judgment of the District Court dismissing the petition and writ was affirmed, and in the three opinions by different Justices of the Supreme Court on review, wherein the judgment was reversed and the cause remanded to the District Court for further hearings, 332 U.S. 708, 727, 731, 68 S.Ct. 316, 92 L.Ed. 309. Accordingly, it is unnecessary to restate them here, except to briefly point out the issue involved and the question which was before the District Court and is now before this Court by reason of the ruling and remand by the Supreme Court.

The petitioner, Grafin Marianna von Moltke, was indicted for conspiracy to violate the Espionage Act of 1917. 50 U.S. C. §§ 32 and 34.[1] Upon arraignment in the District Court before District Judge Moinet on September 21, 1943, she stood mute and a plea of not guilty was entered. On October 7, 1943, before District Judge Lederle, she waived her right to be represented by counsel and changed her plea of not guilty to guilty. On August 7, 1944, she filed a motion for leave to withdraw her plea of guilty on the ground that it was made without knowledge of her legal rights and without a thorough understanding of the nature of the offense charged. This motion was denied by Judge Moinet on November 14, 1944 and on the same date she was sentenced to imprisonment for a term of four years. The petitioner then filed her petition for writ of habeas corpus, which was heard by District Judge O'Brien. Judge O'Brien ruled that the only substantial question in the case was whether the petitioner intelligently and knowingly waived her constitutional rights, that the evidence was overwhelming against her contentions, that she understood the charge and the proceedings, and "freely, intelligently and knowingly waived her constitutional rights." Ex parte von Moltke, 72 F.Supp. 994, 997. On appeal, this Court affirmed the judgment of the District Court, one Judge dissenting.

In view of the present status of the case, the following factual issue is important and is briefly reviewed. The hearing in the District Court developed the fact that following her arraignment and plea of not guilty Mrs. von Moltke was continuously visited and questioned by agents of the Federal Bureau of Investigation, and that during such a visit by agents Collard and Hanaway, agent Collard, who was an attorney, attempted to explain the indictment to her and the nature of a legal conspiracy. Mrs. von Moltke claimed this occurred on or about September 27, 1943, while agent Collard, after refreshing his recollection from certain records, testified it was on October 2, 1943. Mrs. von Moltke claimed that Collard gave as an example what he called the "Rum Runners," explaining that if there was a group of people in a "Rum" plan to violate the law, and another person was there who didn't know the people who were planning the violation and didn't know what was going on, and the plan was later carried out, in law the person who was merely present was guilty of conspiracy. Such advice, if given, even though given in good faith,

---

1. See 1948 Revised Criminal Code, 18 U.S.C.A. §§ 794, 2388.

was nevertheless erroneous. Agent Collard testified that he did not remember using such an illustration, but it was quite possible that Mrs. von Moltke's memory was better than his and he may have used such an illustration. It was this phase of the case that was considered crucial by the Judge of this Court who dissented from the majority ruling and by the Supreme Court on review of this Court's ruling.

On review by the Supreme Court, four Justices were of the opinion that Mrs. von Moltke was entitled to counsel other than that given her by Government agents; that when she pleaded guilty she did not have that full understanding and comprehension of her legal rights indispensable to a valid waiver of the assistance of counsel; and that the admitted circumstances did not support a holding that Mrs. von Moltke intelligently and understandingly waived her right to counsel. Three members of the Court were of the opinion that the issues in the case were factual and dealt largely with the credibility of witnesses; that the uniform findings of fact against her by the three trial judges who separately saw and heard her were amply sustainable; that the trial judge in the habeas corpus hearing found the factual issues overwhelmingly against the petitioner; that there was nothing in the printed record sufficient to convince them that if they had seen the witnesses and heard the testimony they would not have reached the same conclusion; and that they agreed with the finding that Mrs. von Moltke had failed in the proceeding to establish that either her plea of guilty or her waiver of counsel in that proceeding was not freely, intelligently and knowingly made. Two members of the Court, in a separate opinion by Mr. Justice Frankfurter, were of the opinion that the appropriate disposition of the case turned on the truth of Mrs. von Moltke's allegation that she was incorrectly advised by the FBI agent about the law of conspiracy; that if she was so erroneously advised it might well have induced her to believe she was guilty, however innocent she may have deemed herself to be; that such a plea of guilty, made under such circumstances, could not be regarded as having been made on the necessary basis of informed, self-determined choice; that on the record before them they could not tell whether the advice which, if given, would have colored the plea of guilty was actually given; that the District Judge's opinion did not resolve those difficulties; and that since the record afforded neither resolving evidence nor the District Court's finding on what they deemed the circumstance of controlling importance, the cause should be sent back "to the District Court for further proceedings with a view to a specific finding of fact regarding the conversation between petitioner and the FBI agent, with as close a recreation of the incident as is now possible." [332 U.S. 731, 68 S.Ct. 327.] The mandate which was issued read in part as follows: " * * * The judgment of the Circuit Court of Appeals is reversed and that of the District Court is set aside. The cause is remanded to the District Court of the United States for the Eastern District of Michigan so that it may hold further hearings and give consideration to, and make explicit findings on, the questions of fact discussed in the separate opinion delivered by Mr. Justice Frankfurter. If upon such further hearings and consideration, the District Court finds that the petitioner did not competently, intelligently, and with full understanding of the implications, waive her constitutional right to counsel, an order should be entered directing that she be released from further custody under the judgment based on her plea."

Following the remand to the District Court, District Judge Picard, in compliance with the Supreme Court mandate, held further hearings on March 10, 15, 16, 17 and 29, 1949. The typewritten record of these proceedings comprises approximately 650 pages. By agreement of counsel, it was ordered that all records, proceedings and evidence in the original hearing before District Judge O'Brien be admitted into and considered as part of the proceeding in the rehearing of the matter before District Judge Picard.

In the rehearing, Mrs. von Moltke's testimony with reference to the FBI agent's

example of conspiracy was slightly different from what she testified to in the first hearing. In the rehearing, she added to the example, alleged to have been used by agent Collard, the additional fact that the person entering the room, not knowing or having ever seen the plotters, "happens to over listen their plan." However, on cross examination, she either refused or was not able to identify any two or more people whom she heard "planning against the government." In the rehearing, agent Collard was asked with reference to the original rum plan example if he gave Mrs. von Moltke that advice. To which he replied "As a lawyer I couldn't have given her that illustration of a rum runner." Then followed these questions and answers:

"The Court: Did you, or didn't you?

"Q. (By Mr. Fordell): Did you give her an illustration?

"The Court: First begin with the illustration. Did you give her the illustration in the manner she has outlined you gave it to her, and if you did not, could she have arrived at that conclusion from anything you said? A. No, sir.

"Q. (By Mr. Fordell): You do recall giving her an illustration, is that it? A. I said at the other hearing it is quite possible I gave her an illustration concerning a Rum Runner's case, yes, sir, but not the illustration as she said in her testimony, no, sir.

"Q. (By Mr. Fordell): Do you recall the illustration that you gave her? A. To the best of my ability now to remember, it is quite possible while talking to Mrs. von Moltke that I used an illustration of a rum runner's case to attempt to show the general law of conspiracy. And to the best of my memory now, if I did use such case, I probably told her that where several people get together and decide among themselves to run rum across the Detroit River and should subsequently one of those persons proceed to run some rum across the Detroit River, those persons who would be together originally agreeing to so run the rum would be guilty of a conspiracy."

The Court asked the witness Collard if it might have been possible for Mrs. von Moltke to have been in such a state of mind as to not have understood the example he gave, to which the witness replied— "I do not think so, your Honor, no, sir." These questions and answers followed:

"The Court: Are you sure that you made clear to her that she must have participated in the agreement? A. Yes, sir.

"The Court: Or understanding? A. Yes, sir.

"The Court: There is no question in your mind but what she understood what you were saying? A. That is right, yes, sir."

Judge Picard, on this factual issue, stated that the Court was met squarely with the issue of credibility, discussed the factors leading to his finding on the issue, referred to the vacillation, inconsistencies and contradictions on the part of Mrs. von Moltke, and resolved the issue in favor of the agent. He stated in his opinion: "We have no hesitancy in resolving the fact issues in favor of the agent. We believe him." He found that Mrs. von Moltke "not only understood that she must overhear the plotters, but in addition that she must have acquiesced and participated in the illegal scheme, and that some one of the plotters must have committed an overt act aimed to carry out the conspiracy."

Judge Picard also made a finding with respect to Mrs. von Moltke's claim that she lacked knowledge of her constitutional right to counsel under an indictment. He referred to the facts (1) that Judge Moinet appointed an attorney to represent her upon her arraignment on September 21, 1943, (2) that agent Collard told her that she should have an attorney to which she replied that she didn't want one, (3) that Mrs. von Moltke's husband continually urged that she do nothing until she consulted an attorney, (4) that Mrs. von Moltke indicated to at least one witness that she was waiting for counsel, and (5) that eventually she made her own decision to ignore her husband's advice about getting an attorney. Her right to counsel was also specifically brought to her attention by Judge Lederle who would not accept her

plea of guilty without her written waiver. Judge Picard found on this issue "that petitioner was aware of her right to counsel which we hold was intelligently and competently waived before Judge Lederle when she pleaded guilty."

With reference to Mrs. von Moltke's contention that she was never apprised that she faced a possible death penalty, Judge Picard referred to the fact that this was a new contention, not raised in the former hearing or appeal, that Mrs. von Moltke testified that she had free access to all the newspapers, that she was depressed by the adverse publicity she was getting, that the newspapers referred to such a possible penalty, and that, in any event, she knew she was subject to some sentence and actually received a moderate sentence of four years. The District Judge found that Mrs. von Moltke was well aware of the possible death penalty and strongly endorsed the language of Mr. Justice Burton in the dissenting opinion of the Supreme Court wherein he said—"She accurately forecast the general character of her sentence * * *."

Judge Picard also found from the consideration of all the evidence that Mrs. von Moltke's knowledge or ignorance of the legal presumption of innocence to which a defendant is entitled played no part in inducing her plea and rejected her contention that she was not aware of her right to trial if she elected to remain on her plea of not guilty. He also pointed out that agent Collard testified that his conversation with Mrs. von Moltke occurred on October 2, 1943, which date was substantiated by his own record prepared in 1944 of cards indicating jail visits. This was after she had decided to plead guilty. Judge Picard accordingly found—"She therefore decided to plead guilty before she received the alleged advice." This factual finding was a clear cut ruling on the credibility of the two contradictory witnesses. In addition to such an issue being exclusively within the province of the District Judge, the ruling is supported by the documentary evidence referred to. It necessarily must be accepted on this review and is a decisive factor in the case.

We do not approve of the long delay between the plea of guilty and the imposition of sentence. But, occurring after the plea of guilty, it played no part in influencing Mrs. von Moltke to enter the plea. The record does not show what, if any, consideration was given by the District Judge in imposing sentence, to the time spent in jail after the plea of guilty and before sentence, but such confinement is usually considered by the District Judge in determining the length of sentence to be thereafter served. However, it likewise played no part in influencing Mrs. von Moltke in reaching her decision.

Judge Picard carefully analyzed the possible reasons and motives inducing Mrs. von Moltke to enter a plea of guilty, supporting his conclusion and ruling that her plea of guilty was freely and competently entered. In keeping with his findings and conclusions, the District Judge entered a judgment dismissing the cause and discharging the writ. The present appeal followed.

It is well settled that in a collateral attack on a judgment in a proceeding of this nature the burden of proof rests upon the petitioner to establish by a preponderance of evidence that she did not competently and intelligently waive her constitutional right to assistance of counsel. Johnson v. Zerbst, 304 U.S. 458, 468-469, 58 S.Ct. 1019, 82 L.Ed. 1461; Hawk v. Olson, 326 U.S. 271, 279, 66 S.Ct. 116, 90 L.Ed. 61. The case was remanded to the District Court for a specific finding of fact, considered by the Supreme Court to be decisive of the ruling in this case. This involved a clear question of credibility of witnesses for the trial judge. The credibility of the witnesses is for the trier of the facts. Hawk v. Olson, supra, 326 U. S. at page 279, 66 S.Ct. at page 120. Rule 52, Rules of Civil Procedure, 28 U.S.C.A. We are of the opinion that the findings of the District Judge on the factual issues disposed of by him are amply supported by the evidence hereinabove referred to, and they are accordingly approved and accepted.

We attach little significance to appellant's contention that agent Collard's tes-

timony, at certain points was not a categorical denial of Mrs. von Moltke's testimony, but was qualified by such expressions as "To the best of my ability now to remember," "to the best of my memory now, if I did use such a case, I probably told her . . .," and "That is what you think you told her? A. Yes, sir." The conversation took place in October 1943; the witness was testifying in March 1949. No notes or memorandum were available. Necessarily, the witness was testifying from memory long delayed, and the qualifying expressions were merely a recognition of that fact. To what extent, if any, it affected his credibility as a witness was one of the factors to be weighed by the trial judge in making his finding. The conflicting testimony of Mrs. von Moltke was likewise subject to the same consideration.

The appellant has failed to meet the burden of proof resting upon her in this proceeding. The judgment of the District Court is affirmed.

McALLISTER, Circuit Judge (dissenting).

While most of the facts in this case have been set forth in the opinions on the prior appeal, the order of the district court dismissing the writ of habeas corpus, now before us, makes it proper to supplement the statement of the circumstances surrounding the case, and to recapitulate them in the light of the present appeal.

Mrs. von Moltke, who was living with her husband and two children, was arrested in her bed at her home between 6:00 and 7:00 in the morning by six agents of the Federal Bureau of Investigation who had been admitted to the house by her husband. She was ordered to get out of bed and dress, while the agents searched the house, after securing her consent, and that of her husband. Mrs. von Moltke was immediately taken to the headquarters of the Federal Bureau of Investigation in Detroit, fingerprinted, photographed, and examined by a physician. She was then subjected to questioning by two agents of the Federal Bureau of Investigation from 10:00 in the morning to 9:00 or 10:00 at night. This questioning continued for five consecutive days. Instead of being placed in a cell, she was locked alone in a room with a solid door, and kept in solitary confinement. She was not allowed to see or speak to anyone. She was not permitted to be visited by her husband or to write a note to him. Her husband did not even know where she was. The matron in charge of her detention was not allowed to speak to her. During this time, she was not told why she had been arrested; no charges had been made against her; she was not allowed to see an attorney; and she was told by the agents that she was not entitled to have an attorney or legal counsel. After five days of solitary confinement, she signed a statement prepared by the agents as a result of questioning her. Nine days after her arrest, she was taken before the Enemy Alien Hearing Board, and at 10:00 o'clock at night, she was subjected to a long examination. Up to this time, she did not know why she was being detained; no charges had been made against her; and she had not been allowed to have legal counsel or see a lawyer. Twenty-six days after her arrest, the matron handed her a copy of the indictment against her for conspiracy to violate the Espionage Act. 50 U.S.C.A. § 31 et seq.[2] Twenty-nine days after her arrest, she was taken before the district court to plead to the indictment. She had no legal counsel, had been given no legal advice, and had not discussed the charges against her with any lawyer or anyone else. When she was brought before the court to plead, the district judge, finding that she was not represented by counsel, stated that she was entitled to legal assistance and would have to have a lawyer to represent her. He called a young attorney from a group sitting in the courtroom and told him to represent her. The lawyer objected and stated that he did not want to have anything to do with the case. The district judge then assured him that it would only be for the arraignment. Upon this assurance and without seeing the indictment or discuss-

2. See 1948 Revised Criminal Code, 18 U.S.C.A. §§ 11, 792, 794, 2388, 3241.

ing it with Mrs. von Moltke, the attorney had a short whispered conversation with her and told her that if she felt she was not guilty, it was advisable to stand mute; and the attorney then informed the court that the prisoner was standing mute. A plea of not guilty was entered. The district judge then told Mrs. von Moltke that he would appoint an attorney for her "right away" and she was then taken to the county jail. After being informed by the court that an attorney would be immediately appointed for her, she waited in jail for another seventeen days. No attorney was thereafter ever appointed to represent her on her trial. She again appeared before the court on October 7, 1943, at which time she withdrew the plea of not guilty, which was entered for her when she stood mute, and pleaded guilty. She was then returned to the jail, where she was held for more than twelve months, during the greater part of which time she sought to withdraw the plea, and plead not guilty. Her motion to withdraw the plea of guilty was finally denied on November 15, 1944, and, simultaneously, she was sentenced to four years in prison.

At the time that Mrs. von Moltke withdrew her plea of not guilty and entered a plea of guilty to an offense which carried the death penalty (of which fact she was ignorant), she had, therefore, been held, either in solitary confinement in the Immigration Detention Home, or imprisoned in the cell block at the county jail, for forty-five days without legal counsel or the appointment by the court of any attorney to represent her on her trial, or the retention by her of any lawyer for this purpose. No lawyer appeared for her or advised her when she pleaded guilty. It is conceded that the only legal advice she could have received during this entire period was that of the agent of the Federal Bureau of Investigation who had conducted the five days of questioning of her at the time of her arrest with the object of indicting her, and who, before advising her on the subject of the law of conspiracy and the significance of overt acts, told her that he was a lawyer and had been regularly admitted to the bar. If she did not have legal advice as to her rights from him, she had no legal advice whatever from anybody on this capital charge, in which, as Mr. Justice Black remarked on the prior appeal,[3] the conspiracy indictment was complex and required assistance of counsel for an understanding of the charges made, inasmuch as "A layman reading the overt act charges of this indictment might reasonably think that one could be convicted under the indictment simply because he had, in perfect innocence, associated with some criminal at the time and place alleged"; and, concerning the general tenor of which, Mr. Justice Frankfurter observed that "Because of its complexity, the law of criminal conspiracy, as it has unfolded, is more difficult of comprehension by the laity than that which defines other types of crimes."

It was undisputed that according to German law, a person accused of crime has the burden of proving his innocence. In the belief that our law was to the same effect, and feeling that she was unable to overcome such a presumption of guilt, Mrs. von Moltke, a German national, after receiving legal advice as to the law of conspiracy and the crime with which she was charged, from the Federal Bureau of Investigation agent, testified she came to the conclusion to plead guilty. She was brought before the district judge for this purpose and signed a mimeographed form, stating that "having been advised by the Court of my right to be represented by counsel, and having been asked by the Court whether I desire counsel to be assigned by the Court, do hereby, in open court, voluntarily waive and relinquish my right to be represented by counsel at the trial of this cause." [161 F.2d 113.] The court asked her if the indictment had been explained to her, and she said yes. The court then asked her if she was pleading guilty because she felt she was guilty, and she said yes. The court did not ask who had explained the indictment to her, and she did not volunteer the information that the

3. Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309.

only legal advice she had received was from the Federal Bureau of Investigation agent. The court did not explain the indictment to her or tell her what she was charged with. Neither did the court nor the district attorney nor anyone else tell her that the crime with which she was charged carried the death penalty. The entire proceeding took up only a few minutes of the court's time, sandwiched in between other proceedings. After her plea of guilty, she was remanded to jail to await sentence. She was then kept in jail for a year, before she was sentenced. In the opinion of the writer, the foregoing circumstances would, in themselves, be enough to require the holding that Mrs. von Moltke did not freely, knowingly, and intelligently waive her constitutional rights to assistance of counsel and a trial.

A few months after her withdrawal of the plea of not guilty and entry of the plea of guilty, and before sentence, on January 17, 1944, she testified that she was informed for the first time by Robert S. Dunham, a Federal Bureau of Investigation agent, that, in the United States, it was necessary for the government to prove a person guilty of a crime rather than for the accused to prove his innocence. On January 18, the day after receiving this information, she had an interview with the district attorney, in which, as he testified, "she wanted to go into the possibility at some time of changing her plea." As proof of the fact that she did not know of the presumption of innocence, this testimony is the most persuasive in the case on this point. Dunham was a witness on the part of the government but did not dispute Mrs. von Moltke's statement that he told her in jail of the presumption of innocence for the first time on January 17; and she immediately saw the district attorney the next day on withdrawing her plea of guilty and entering a plea of not guilty. The district attorney later consulted the district judge, in March 1944, on the matter, but it dragged on until June 1944, when the district attorney appeared before the court with Mrs. von Moltke and suggested to the court that an attorney be appointed for her in order to file a motion to withdraw her plea of guilty. The court stated that she was within her rights in filing such a proceeding, and afterward appointed a lawyer, on August 2, 1944, to file the motion for her and to represent her in the matter; and in five days, such counsel filed a motion to withdraw the plea of guilty. It was not, however, heard by the court until three and a half months later, on November 15, 1944. At that time, the court denied the motion to withdraw the plea and immediately sentenced appellant to four years of imprisonment on her plea of guilty. The court denied the motion to withdraw the plea of guilty on the ground that it was made too late under former Rule II (4) of the Rules of Procedure for Pleas of Guilty then in effect, which provided that a motion to withdraw a plea of guilty must be filed within ten days of the entry of such plea. Up to the time of the court's decision on the motion, the district attorney was not certain that the time limit in the rule was mandatory, and testified on the hearing that there was some question in his mind at that time whether the rule was mandatory. It likewise seems to have been a matter of doubt in the mind of the district judge whether the rule was mandatory prior to the time of his decision, although he subsequently determined, by his decision, that it was.

During all of this time, Mrs. von Moltke was being held at the Wayne County jail. She was not sentenced until twelve months after her plea; and ten months after she had discussed the possibility of withdrawing her plea of guilty with the district attorney. At the time of her sentence, she had, therefore, been held in jail for more than fourteen months from the time of her arrest, waiting during most of that period, to withdraw her plea of guilty; and apparently everybody, including the court, considered that she was fully within her rights in withdrawing the plea and that the plea was to be withdrawn, until, at the last moment, her motion was denied because of the time limitation governing motions to withdraw pleas of guilty contained in the Criminal Rules, and she was forthwith sentenced. If any other excuse existed

for holding her in jail for a year after her plea of guilty before she was sentenced, it does not appear; and no credit for this protracted period of imprisonment was allowed by the sentencing court.

With the foregoing as a recital of the background of the controversy before us, we come to the question of the legal advice which Mrs. von Moltke received from E. Bert Collard, Jr., the agent of the Federal Bureau of Investigation. It was mainly upon this phase of the case that the Supreme Court reversed the judgment and remanded the case for further consideration on the prior appeal; and it is upon the determination of this matter that the present appeal must largely depend.

Not having had the benefit of the assistance of legal counsel before her plea of guilty, Mrs. von Moltke, on her prior hearing, testified that she repeatedly asked the agents of the Department of Justice for advice as to whether she should plead guilty or not. One agent testified that he absolutely refused to inform her as to her rights or to give her any legal advice. In the course of her difficulty, however, she had a conversation with Agent Collard, who volunteered the information that he was a lawyer and had been duly admitted to practice. Because of her acquaintance with him during the various examinations and interrogations which he had conducted, Mrs. von Moltke appealed to him to explain the indictment to her and to inform her of the meaning of conspiracy and overt acts. He agreed to do so, and secured an office in the jail for this purpose. According to Agent Collard, his explanation to Mrs. von Moltke of the meaning of conspiracy lasted for several hours.

This case has already engaged the extensive consideration of the courts. Four different district judges have taken part in its decisions; with the present adjudication in this court, the case has elicited four opinions on two appeals; and on the prior appeal in the Supreme Court, three opinions with differing conclusions were announced. It was remanded by the Supreme Court for further hearings and explicit findings as to the legal advice given by the agent of the Federal Bureau of In-

vestigation, to Mrs. von Moltke, with as close a re-creation of the incident as possible, and for decision as to whether Mrs. von Moltke competently, intelligently, and with a full understanding of the implications, waived her constitutional right to counsel. As Mr. Justice Frankfurter expressed it, from the record then before the court with respect to the testimony of Collard on the crucial points of the case, he could not at that time "re-create his tone of voice or the gloss that personality puts upon speech."

On the hearing after remand, the district court found that Collard had not given the legal advice to Mrs. von Moltke which she claimed; that she did not rely upon such advice in changing her plea of not guilty to guilty; that she knew that her plea subjected her to the death penalty; and that she competently, intelligently, and with full understanding of the implications, pleaded guilty.

From an examination of the record, I am of the opinion that the findings of the district court are not sustained by substantial evidence. To show why the findings are not sustained by substantial evidence, it is necessary to repeat a certain part of what had heretofore been recited in prior opinions in order to compare the vital and controlling testimony of Mrs. von Moltke and Collard on the first hearing and on the last hearing before the district court; and this can be best done by sufficiently comprehensive quotations of the testimony on these crucial points. In such manner, too, can be most nearly re-created the incidents that control decision in this case.

On the first hearing, Mrs. von Moltke testified that when Collard explained the indictment to her, she told him that she had never committed any of the overt acts charged against her. She further testified that Collard assured her that he knew she was telling the truth—and, in this, she was undisputed. She further testified: "Mr. Collard explained to me that the 'Overt' Acts in the indictment do not mean the real thing. * * * Mr. Collard explained to me that the indictment doesn't cover the charge, and I seemed not to be

able to understand, so Mr. Collard explained the indictment to me by an example, which he called the 'Rum Runners'. * * * That if there is a group of people in a 'Rum' plan who violate the law, and another person is there and the person doesn't know the people who are planning the violation and doesn't know what is going on, but still it seemed after two years this plan is carried out, in the law the man who was present becomes . . . the person is guilty of conspiracy. And I said to Mr. Collard: 'If that is the law in the United States, I don't know how I ever can prove myself innocent, and how will any judge know how am I guilty if this is the law?' * * * Then I said: 'How will any judge know how to judge me like that, if one is innocent and the law is such and such?' And Mr. Collard told me about the Probation Department. * * * He explained to me that it is the duty of this office—the Probation Department—to collect the proper data and present it to the judge, so that the judge will know what to go by." [161 F.2d 118.]

Collard was a witness at that time, and on this phase of the case, testified:

"Q. Did you try to explain it (the indictment) to her? A. Yes, as I remember, I did. * * *

"Q. Well, in explaining the indictment to her, what explanation did you give her? A. I just tried to explain it the best I could. * * *

"Q. Did you explain to Mrs. von Moltke the nature of a conspiracy? A. I attempted to, yes.

"Q. To the best of your ability? A. Yes, sir.

"Q. And did you spend some time on that particular phase of your explanation? A. I do not recall, but we probably did.

"Q. And did you during that discussion use an illustration about a rum runner? A. Well, I heard Mrs. von Moltke say that, and since she did I have been trying to recall, and I cannot remember such an illustration.

"Q. I see. A. But it is quite possible that Mrs. von Moltke's memory is better

than mine, and I may have used such an illustration. * * *

"Q. Did you in any way explain, or attempt to explain to Mrs. von Moltke the meaning of the word 'feloneously'? A. I cannot remember her asking that, but if she did ask me, I probably tried to explain it to her; but whether that was one of them, I just don't remember. * * *

"Q. And did you explain to Mrs. von Moltke the nature of an overt act? A. Well, if she asked me, I probably tried to, but whether she asked me or not I just don't remember.

"Q. And did Mrs. von Moltke ask you whether merely conferring with people who later turned out to be guilty of criminal acts would also make her a criminal, and guilty of criminal acts? A. I do not just recall that particular question. It is quite possible."

On the second hearing, Mrs. von Moltke testified, with regard to the advice given by Collard: "Mr. Collard then explained the nature of business of a rum runner, and he then brought that out and said if several people are in one room and plan violation of the law, to hijack rum, and another person enters the room, they don't know—the person entering the room does not know the other people, he or she has never seen them, but happened to over listen their plan, and even after this plan is carried out, two years later, and the government becomes aware of the fact that the person at the time listening in to their planning, the person is guilty of conspiracy under the American law. That is what I understood Mr. Collard explained to me."

This was the crux of the case. Did Collard give her this advice? The answer to this question must be judged from his testimony. My reasons for being of the opinion that the district court's findings were not supported by substantial evidence are influenced mostly by Collard's testimony itself.

When Collard was sworn as a witness, the district attorney read Mrs. von Moltke's testimony, above set forth, as to what he told her, and he was asked:

"Q. Did you give her that advice? A. *As a lawyer* I couldn't have given her that illustration of a rum runner." (Emphasis supplied.)

The court and the district attorney noticed at once that Collard was not contradicting Mrs. von Moltke's testimony on this crucial point, but was evasive on the issue. The court, however, insisted on having an answer to the question whether he had given the advice, as claimed by Mrs. von Moltke.

"The Court: Did you, or didn't you?

"Q. (By Mr. Fordell, the district attorney) Did you give her an illustration?

"The Court: First begin with the illustration. Did you give her the illustration in the manner she has outlined you gave it to her, *and if you did not, could she have arrived at that conclusion from anything you said?* A. No, sir.

"Q. (By Mr. Fordell) You do recall giving her an illustration, is that it?"

The witness was guided by suggestive and leading questions in his testimony on the crucial point. The above question, however, was answered in this fashion: "A. I said at the other hearing *it is quite possible* I gave her an illustration concerning a rum runner's case, yes, sir, but not the illustration as she said in her testimony, no sir."

What the witness actually said at the other hearing was, as heretofore stated, that he could not remember using an *illustration about a rum runner,* "But it is *quite possible that Mrs. von Moltke's memory is better than mine,* and I may have used such an illustration."

Here, the court interposed:

"The Court: The court would be interested, Mr. Fordell, in knowing what the illustration was he gave her, *if he did give her one.*

"Q. (By Mr. Fordell) Do you recall the illustration that you gave her? A. *To the best of my ability now, to remember, it is quite possible* while talking to Mrs. von Moltke that I used an illustration of a rum runner's case to attempt to show the general law of conspiracy. And to the best of my memory *now, if I did*

*use such case, I probably* told her that where several people get together and decide among themselves to run rum across the Detroit River, and should subsequently one of those persons proceed to run some rum across the Detroit River, those persons who would be together originally agreeing to so run the rum would be guilty of a conspiracy.

"The Court: That wouldn't be exactly true either, would it, Mr. Fordell?

"Mr. Fordell: It is the general law if two people agree to violate a law and one commits an overt act to carry out that agreement, both of them are guilty.

"The Court: Yes, if one of them does anything to carry it out.

"Mr. Fordell: That is right. A. (Mr. Collard) *That is what I meant to say.*"

Everything in the foregoing that Collard testified to was entirely suppositious and hypothetical and of so little probative value that it would have been error on the part of a court to refuse to strike it out on motion in the course of a trial. At the prior hearing, Collard testified he could not remember anything with respect to using an illustration about a rum runner, but that it was quite possible that Mrs. von Moltke's memory was better than his and that he may have used such an illustration. He seems to have been a humane man and an inherently honest witness. He testified, on the last hearing, that he considered Mrs. von Moltke's memory, at that time, every bit as good as it was on the first hearing. It is of the highest importance to keep in mind that his testimony as to the legal advice he gave Mrs. von Moltke and the illustration of the rum runner was based upon circumstances that he admitted he did not remember, and was explicitly restricted by him to a supposition—"it is quite possible * * * if I did use such case, I probably told her. * * *" With this primary and controlling premise as the foundation of his testimony, the following continuation of his evidence does not detract from the fact that all his testimony was admittedly based on supposition. And this conclusion is emphasized by the fact that his answers

were elicited only by a series of leading and suggestive questions.

Continuing the testimony of Collard:

"The Court: That is, it is possible for one to withdraw from a conspiracy—I will have to read that. In other words, according to her statement she had the idea if she happened to be in the room where some people conspired, and two years afterwards if they did something, the fact she was in the room would be sufficient to convict her. Did you ever give her any such information? A. No, sir. That I definitely did not give her, no sir.

"The Court: That wouldn't be anything near the law, would it? A. No, sir, it would not be.

"The Court: And there has to be an agreement in a conspiracy, and one person must do an overt act? A. That is right.

"The Court: And if one person does an overt act then those who have agreed to the conspiracy, are all liable? A. Yes, sir.

"The Court: *That is what you think you told her?* A. Yes, sir.

\* \* \* \* \* \*

"The Court: Of course, in giving any kind of illustration you didn't go into all the details and possibilities? A. No.

"The Court: *Are you sure that you made it clear to her* that she must have participated in the agreement? A. Yes, sir.

"The Court: Or understanding. A. Yes, sir.

"The Court: It didn't have to be in writing. A. That is right, it doesn't have to be in writing.

"The Court: There is no question in your mind but what she understood what you were saying? A. That is right, yes, sir."

Taking the foregoing testimony of Collard as a whole, together with his prior admissions that he remembered nothing of using any illustration of a rum runner, and his concessions that Mrs. von Moltke's memory was better than his own, it is impossible to conclude that such testimony constitutes substantial evidence to sustain findings based upon it; and this view is confirmed by a reference to his testimony on the many other crucial matters hereafter set forth. The government argues that the weight of the evidence and the credibility of the witnesses was for the trier of the facts, and its findings thereon can not be disturbed. "Of this proposition it is sufficient to say that, if it is the law, it is not the whole law. When fully stated, the principle, like most legal abstractions, embodies universally recognized qualifications and exceptions. The jury's right to be 'sole judge' of the matters mentioned does not exist where their judgment is against the plain and decided preponderance of the evidence, and the question whether this preponderance exists rests finally with the court. This judgment of the court, litigants have the right to invoke, and the performance of this duty neither trial nor appellate court may timidly or indolently evade." Burgess v. Gilchrist, 123 W.Va. 727, 17 S.E.2d 804, 810, 138 A.L.R. 676, 684. Although, in the instant case, we are concerned with what is described in the federal courts as "substantial evidence" rather than the "clear preponderance of the evidence" or the "sufficiency" of the evidence as a basis of recovery, as the court put it, the rule is the same; for when it is made to appear that there is a want of substantial evidence to support a charge appealed from, the case must be reversed. United States v. McAlister, 9 Cir., 88 F.2d 379. And substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S. Ct. 206, 83 L.Ed. 126. Moreover, a fair reading of Collard's testimony, with its uncertainties, contradictions, and vagueness in relation to the facts as testified to by Mrs. von Moltke, and in many cases, his total failure to remember many of the most crucial events in which he was one of the chief participants, does not really present an issue of credibility as between these two witnesses. The foregoing conclusion is strengthened too by the fact that

on both hearings before the district court, Mrs. von Moltke testified that throughout her interviews with Collard, she told him repeatedly that she had not committed any of the overt acts with which she was charged in the indictment, and that Collard, in response, told her that he knew she was telling the truth about such acts; and although Collard was also a witness on behalf of the government on both hearings, he, in no way, contradicted or disputed this testimony. Accepting such testimony as true, it is impossible to believe that Collard himself considered that Mrs. von Moltke would be guilty, under the law, of the charges made against her in the indictment, and that, rather, he must have labored under a misapprehension of what constituted guilt under the complicated law of conspiracy.

At the time Collard gave the legal advice to Mrs. von Moltke as to the law of conspiracy and overt acts, as well as the illustration of the rum runners, he had practiced law only three years. In his practice, he had never been engaged in any case involving the law of conspiracy or in any prosecutions under the prohibition or other liquor acts. He testified he could not remember why he thought it necessary to use an illustration involving rum runners or why he thought that Mrs. von Moltke would understand such an illustration.

All of Collard's testimony depended entirely upon his memory, and where he was not admittedly mistaken, he could not remember even the most important features of his conversations with Mrs. von Moltke and his advice to her. On the first hearing, he deferred to Mrs. von Moltke's memory on the crucial matters. On the second hearing, he could hardly remember anything that he had testified to on the first hearing, and to all questions referring to his previous testimony, his reply was that if the record showed he had so testified, he would stand by it.

On the prior hearing, Collard was asked:

"Q. And did Mrs. von Moltke ask you whether merely conferring with people who later turned out to be guilty of criminal acts would also make her a criminal, and guilty of criminal acts? A. I do not just recall that particular question. It is quite possible." .

On the later hearing, when asked whether he had testified to the foregoing on the prior hearing, his answer was: "A. If that is what the record says, that is what I said, yes.

"Q. If that is what the record says, you don't dispute it? A. I don't dispute anything in the record.

* * * * * *

"Q. And you did discuss that matter with Mrs. von Moltke? A. It is just like the answer says, I don't recall doing it, but it is quite possible, it could have been. Yes.

"Q. Is your recollection on that point any better now than it was then? A. I hardly think so."

As bearing upon Collard's memory on one of the important phases of the case, he was asked as to his questioning Mrs. von Moltke at the Immigration Home:

"Q. Did you or did you not tell her she was not entitled to an attorney?

* * * * * *

"A. I just don't remember."

Concerning the advice which he gave her after her indictment, Collard was asked:

"Q. What questions did Mrs. von Moltke ask you about the indictment? A. I don't recall any right now.

* * * * * *

"Q. Did Mrs. von Moltke ask you in connection with the overt acts whether the things that she was charged with doing, such as introducing people to one another and conferring with people, might not have been innocent on her part? A. It is quite possible she did. I just don't remember.

* * * * * *

"Q. (By Mr. Field) What did you tell Mrs. von Moltke that she was charged with?

"Mr. Fordell: I object to that question, your Honor.

"The Court: If he can remember.

"Mr. Fordell: The question is predicated on the assumption that he formally told her what the charges were.

"The Court: This man is an FBI. If he can't take care of himself on the stand, neither you nor the court can. * * * Give me the question again, please. (Question read)

"Mr. Fordell: That is assuming that he told her what she was charged with—

"The Court: If he didn't, he can say so, can't he, how much in detail he went? He may answer.

\* \* \* \* \* \*

"A. I just can't remember. Is there any specific thing you want to know? I can't remember in general.

\* \* \* \* \* \*

"Q. * * * did Mrs. von Moltke tell you that she had heard from a fellow prisoner that unless she pleaded guilty to the indictment her husband would be arrested? A. I don't remember.

\* \* \* \* \* \*

"Q. Did Mrs. von Moltke, after the conference about the indictment, ask you whether, if all the other defendants in the case pleaded guilty, she would be entitled to have a trial?

\* \* \* \* \* \*

"A. I am sorry, I don't remember that.

\* \* \* \* \* \*

"Q. Did, at that time, you advise Mrs. von Moltke that if she went to trial the Government would have to prove those charges against her by evidence beyond a reasonable doubt? A. I don't remember.

"Q. Do you think you did?

\* \* \* \* \* \*

"A. I said I don't know.

"Q. There is no doubt in your mind, is there, Mr. Collard, that you did advise Mrs. von Moltke concerning the Probation Department?

\* \* \* \* \* \*

"A. I don't remember so advising her about that."

As bearing upon his memory of what he testified on the former hearing, he was asked:

"Q. Getting back to a former question at the prior hearing, were you asked the following questions and did you give the following answers:

"'Q. Now, you mention also in your affidavit that Mrs. von Moltke discussed with you her desire to change her plea of guilty, and that you advised that it was her privilege to do so, and informed her of the proper way to get in touch with the United States Attorney? A. Yes.'

"'Q. You did that, didn't you? A. Yes, sir, I did that.'

"'Q. And you told her that was her privilege to change her plea? A. Yes, I certainly did.'

"A. That isn't my testimony. That is another agent's testimony.

"Q. You don't think that was your testimony? A. I say, if the record shows that is my testimony, I certainly said it, yes, sir.

\* \* \* \* \* \*

"The Court: He says if he did say it, but he says he thinks it is somebody else's testimony you are reading from; is it or is it not?

"Mr. Fordell: No.

"Mr. Field: It is Mr. Collard's testimony. A. All right, I am sorry. I was in error."

In view of the repeated failure of the witness Collard to recall any of the important matters in his discussion with Mrs. von Moltke and his advice to her, it can hardly be said that his testimony, given on the last hearing with regard to the illustration of rum runners, because of its qualification, and suppositious and hypothetical character, constituted substantial evidence to sustain findings based upon it. However, even with regard to this illustration, his memory was not to be trusted, as evidenced in his cross-examination on this point. After he had stated that he could not recall whether Mrs. von Moltke asked him whether merely conferring with people who later turned out to be guilty of criminal acts would make her guilty of criminal acts, he was asked:

"Q. And you did discuss that matter with Mrs. von Moltke? A. It is just like the answer says, I don't recall doing

it, but it is quite possible, it could have been. Yes.

"Q. Is your recollection on that point any better now than it was then? A. I hardly think so.

"Q. But it is better now than it was then with respect to the illustration that you used, is that right? A. Yes, sir, because I was never asked a question before on the illustration."

Here the witness was completely mistaken because, on the prior hearing, he had been asked the question about the illustration:

"Q. And did you during that discussion use an illustration about a rum runner? A. Well, I heard Mrs. von Moltke say that, and since she did I have been trying to recall, and I cannot remember such an illustration.

"Q. I see. A. But is is quite possible that Mrs. von Moltke's memory is better than mine, and I may have used such an illustration. * * *"

On the last hearing, Collard was asked:

"Q. (By Mr. Field) On the first hearing in this court you testified that you believed that Mrs. von Moltke's memory was better than yours, is that correct? A. If it is in there, yes, sir.

"Q. Only if it is in there? A. Well, if I testified at the former hearing to such a fact, I am sure it will be in the record.

"The Court: No, he didn't ask you that. 'Do you say that?' 'What do you say now?' I think it would be better to put it in that way, don't you, Mr. Field? As to whether you think her memory is better than yours, if you said before it was, what do you say now? A. It is every bit as good now as it was before.

"Q. (By Mr. Field) Whose? A. Mrs. von Moltke's."

The contention that, on the second hearing, there was a direct denial on the part of Collard that he gave the illustration of the rum runners, as testified to by Mrs. von Moltke, this denial having been absent on the first hearing, is not impressive, in view of the nature of his testimony, as above set forth.

In view of the fact that Collard had told Mrs. von Moltke that she was not entitled to see a lawyer or have any legal counsel during the period of her arrest on the Presidential warrant, it was important to ascertain whether he had subsequently informed her that she was entitled to legal counsel after her indictment, as she continued to remain under arrest during all of the period up to her final plea. He was asked:

"Q. (By Mr. Field) Did you at any time after the indictment had been served on Mrs. von Moltke advise her that she had been technically rearrested on the indictment and released from the proceedings under which she was arrested under a Presidential warrant? A. I don't remember, Mr. Field.

"Q. You don't remember that you did that? A. No sir. The record may so reflect. I do not know.

"Q. Do you recall now any occasion when you told Mrs. von Moltke that the situation, so far as her right to have counsel was concerned, was any different after she was indicted than it was before she was indicted? A. I just don't recall.
* * * * * *

"Mr. Fordell: I understood they were not entitled to counsel if arrested under Presidential warrant.

"The Court: It doesn't make any difference. *She certainly is entitled to counsel when she is indicted.*

"Mr. Fordell: There has never been any question about that.

"Mr. Field: No, unless she was informed, your Honor. But now that she was indicted she was entitled to counsel. She didn't know it. This woman is not a woman who is versed in legal lore or regulations.

"The Court: Is the contention made here she wasn't informed of her right to have counsel?

"Mr. Field: That is right."

As part of defendant's proof in showing that Collard told her when she was arrested and held at the Immigration Detention Home that she was not entitled to legal counsel, and that he never subsequently ad-

vised her, after her indictment, that she was entitled to counsel, Collard was asked:

"Mr. Field: * * * In the lower court, on the original hearing, * * * you were asked the following questions, and did you make the following answers:

 \* \* \* \* \* \*

" 'Q. What, if anything, did you say to Mrs. von Moltke to indicate to her that the indictment was a new proceeding?

 \* \* \* \* \* \*

" 'A. As I recall it, when I first went over to the County Jail at Mrs. von Moltke's request on October 2, she had the indictment, and I explained to her that she had been indicted by the Federal Grand Jury, and I explained to her that technically she had been rearrested on that indictment, and she told me that she had been arraigned; * * * So if that is what you mean by "new procedure," I did tell her that.'

"Q. Do you recall so testifying? A. Yes, sir. I don't deny anything that is in the record, Mr. Field.

"Q. And did you, in addition to telling Mrs. von Moltke that she had been technically rearrested, advise her that now she was entitled to the assistance of counsel under the Sixth Amendment to the United States Constitution? A. I don't remember, Mr. Field.

 \* \* \* \* \* \*

"Q. (By Mr. Field) Mr. Collard, at the time you had the conference at the County Jail with Mrs. von Moltke, do you recall her telling you she believed the attorney who was to be appointed by Judge Moinet had not appeared, and that he wouldn't appear because she was an alien, and therefore, not entitled to counsel? A. I don't remember that, Mr. Field."

Mrs. von Moltke testified that after she had been arrested on a Presidential warrant, she was told by Agent Collard that she was not entitled to have any legal advice, or consult a lawyer. She stated that she did not realize the fact that the indictment, thereafter returned against her, entitled her to have legal counsel, and she further testified that she thought the district judge in-

formed her that he would appoint a lawyer for her only because of his being unaware of the fact that she was an enemy alien. The record on this phase of the case is as follows:

"Mr. Field: The position is this: That Mrs. von Moltke was advised before the indictment that she was not entitled to counsel. * * * And after she got the indictment she was not advised that she was entitled to counsel; * * * She didn't know it was a different proceeding at all.

"The Court: You haven't asked her that.
\* \* \*

"Q. (By Mr. Field) Were you represented by counsel prior to the time that you received the indictment? A. No.

"Q. Were you represented by counsel after you received the indictment? A. No.

"Q. Were you told by anybody representing the Government after you received the indictment that you were then entitled to have the assistance of counsel? A. No.

"Q. And when you appeared for arraignment before Judge Moinet were you advised then that you were entitled to counsel? A. I was told then that I have to have counsel. * * * Judge Moinet asked whether I had funds to retain a counsel and I told him I had not. And so he says he would appoint counsel for me.

"Q. And did he appoint counsel to represent you at the arraignment?

 \* \* \* \* \* \*

"The Court: What does it say on the record, that he just appointed counsel for the arraignment?

"Mr. Field: For the arraignment only.
 \* \* \* \* \* \*

"Q. (By Mr. Field) And at the conclusion of the arraignment was anything said to you by Judge Moinet about any other counsel? A. Judge Moinet said he would send counsel right away.

"Q. Right away? A. Yes.
 \* \* \* \* \* \*

"Q. After the arraignment did any counsel come from Judge Moinet to represent you in the case? A. No.

"Q. And did any counsel ever come who had been appointed by the court to represent you at the trial? A. No."

It was undisputed that at the time of her arrest on a Presidential warrant and during the twenty-nine days of her imprisonment until the indictment was returned, Mrs. von Moltke had been told that she had no right to see a lawyer or to have assistance of counsel. After she had been brought before the court and advised to stand mute by the counsel appointed in open court, who, as heretofore stated, refused to serve except for the arraignment, she was told by the court that a lawyer would be appointed for her right away to help her on her trial. When no lawyer ever appeared, Mrs. von Moltke concluded, according to her testimony: "I thought that there must have been some mistake in that Judge Moinet wasn't aware of the fact that I was an enemy alien, as he said he would appoint counsel for me. *I was not aware of the fact that I, even as an enemy alien, enjoyed the protection of the constitution at this time,* so I thought that there would be no counsel appointed for (me).

"Q. And were you so advised at the time you were arrested that as an enemy alien you had no right to counsel? A. I had no right to counsel.

"The Court: By whom?

\* \* \* \* \* \*

"A. Twice, once by an agent of the FBI.

\* \* \* \* \* \*

"The Court: Is that the rule, enemy aliens are not entitled to an attorney?

"Mr. Field: That is the rule.

"Mr. Fordell: Not entitled to have counsel at the Enemy Alien Hearing.

"The Court: All right, then they told her the truth.

\* \* \* \* \* \*

"The Court: Now he did appoint an attorney for her? He appointed an attorney at the arraignment?

"Mr. Field: At the arraignment, yes, your Honor, he said he would appoint another attorney right away to represent her at the trial.

\* \* \* \* \* \*

"The Court: You say he never appointed one?

"Mr. Field: The file shows no appointment and no attorney appeared, your Honor.

"The Court: All right."

The government emphasizes that even though Judge Moinet sent no counsel to Mrs. von Moltke after he had told her he would do so, nevertheless, Judge Lederle would accept her plea of guilty only on a written waiver of right to counsel; and that, therefore, she knew she had such a right. This is not very persuasive. She had been advised at the time of her arrest that she had no right to counsel. When Judge Moinet failed to send counsel, she assumed that he had been mistaken when he said he would do so because of the fact that he was unaware that appellant was an enemy alien; and she did not know that, as an enemy alien, she had the protection of the Constitution. If her conclusion was reasonable with regard to Judge Moinet, it was equally reasonable with regard to the judge who accepted her plea.

The district court referred, in his findings, to the fact that Collard, as well as another agent, had told Mrs. von Moltke that the question of her plea should be discussed with her attorney and that she replied she did not want an attorney; that her husband urged her to do nothing until she had consulted legal counsel and even specified the name of the attorney. A fair reading of the record, however, shows that these statements revolved around the two young lawyers who had come to see her at her husband's request while she was in jail. These lawyers had been students of her husband in the Language Department of Wayne University. The undisputed evidence showed that they never agreed to be her counsel, never gave her any legal advice, informed her that they would not represent her, and warned her that they would not even hold what she said in confidence, but would feel free to disclose anything she said to the district attorney. Her desire to avoid such kind of advisers and her declining to consult further with them hardly warrants the conclusion that she deliberately rejected legal counsel. The district

court, in its opinion, referred to the testimony of one of the agents who testified that he said to Mrs. von Moltke that they understood her husband was interested in obtaining an attorney for her and that, in reply, she jerked her shoulders and said she was not interested. The attorney in question, whose name her husband had suggested, was one of those who had told her that he would not represent her or hold what she said in confidence. Mrs. von Moltke testified that he had treated her so insolently when he came to the jail that, in ordinary life, she would have left the room in humiliation. In this connection, it is to be noted that immediately upon her arrest, her husband was discharged from his teaching position at the University and was obliged to support his family as a clerk in a drugstore at $35.00 a week; that neither Mrs. von Moltke nor her husband had any funds for the employment of attorneys; and that they could secure legal counsel only by appointment of the court.

Mrs. von Moltke testified that she was never told by anyone of the consequences of her plea of guilty, and was never informed that the crime with which she was charged carried the death penalty. The trial court seemed skeptical about this testimony and remarked: " * * * if she didn't know, an intelligent woman, if she didn't know by the time she pled guilty, if she didn't know that they could send her up for life or the death penalty, it seems very funny to me. But it isn't any queerer than the fact that so far somebody among the District Attorneys, or the FBI, or somebody at some time didn't tell her that, if she didn't know it."

With regard to representatives from the district attorney's office, the court stated: "I am pretty sure that John Babcock (Chief Assistant District Attorney)—John Babcock is a rather careful attorney, *he would have made sure she understood what was in the indictment.*"

But Mr. Babcock testified that he never advised Mrs. von Moltke with regard to the indictment, or even discussed it with her. As to the representatives of the FBI, mentioned by the court, Collard, who was the only one who consulted and advised with

Mrs. von Moltke with respect to the indictment, testified:

"Q. (By Mr. Field) Did you at any time advise Mrs. von Moltke of the possible consequences of a plea of guilty? A. I don't remember.

"Q. Did you hear anyone advise her of the consequences of such a plea? A. I don't remember so hearing anyone.

"Q. You didn't tell her that by pleading guilty she would subject herself to the death penalty, did you? A. I don't remember so telling her."

Mrs. von Moltke had testified that during the time she was confined to the county jail, there was a daily delivery of newspapers and that they were made available to her and that she read them. The government, in order to show that she had learned about the death penalty from newspaper accounts, introduced a number of Detroit newspapers dated September 17 and September 18, 1943, which contained statements that the crime with which she was charged carried the death penalty. But Mrs. von Moltke was confined to the Immigration Home until September 21, where there was no delivery of newspapers, and she was not confined in the county jail until noon of September 21; and she declared that she had never seen any newspaper accounts of the penalty for the crime charged. The trial judge then asked:

"The Court: When she pled guilty didn't it appear in the paper that she might face the death penalty?

"Mr. Field: * * * I don't know.

"The Court: When she was arraigned, didn't it appear that way? You get a lot of things in there that aren't important; they must have gotten that in.

"Mr. Field: There is no testimony that she was informed either by Judge Lederle or Judge Moinet that she might be subject to the death penalty.

"The Court: Well, I *suppose the Judge thought she had been over there so much with the other members, and so much of it in the paper, that she knew the consequences of her act.*

 * * * * * *

"Mr. Field: That could be a fatal error if that supposition is true.

"The Court: If she didn't know about the death penalty?

"Mr. Field: Yes, your Honor.

"The Court: It might be, but I don't see how it is possible anybody charged with this kind of crime, with all the publicity there was, and her husband out of jail and reading, how it would be possible for her not to know that the death penalty might not be the result.

"Mr. Field: On the other hand, your Honor, it isn't expected the defendant will learn of the nature of the penalty from the newspapers.

"The Court: Don't forget this, the burden of proof is on her here now.

"Mr. Field: Yes, your Honor.

"The Court: I don't care where she gets the information, if she gets it.

"Mr. Field: I think due process of law, your Honor, would require that the defendant be advised of the penalty.

"The Court: That certainly is true, but the question isn't now whether she is guilty or not guilty, the question is, Did she know what she was doing? I don't know whether it is absolutely necessary that she know the penalty. The Supreme Court didn't say.

"Mr. Field: Yes.

"The Court: No, the Supreme Court said it didn't appear that she was so advised as bearing upon whether she knew what she was doing or not.

"Mr. Field: That is right, your Honor.

"The Court: But that doesn't mean she has got to know what the penalty is."

"Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences." Kercheval v. United States, 274 U.S. 220, 223, 47 S.Ct. 582, 583, 71 L.Ed. 1009. When a person accused of crime appears before the court without legal counsel on a plea of guilty to a charge carrying the death penalty, it would seem to be a deprivation of constitutional right to accept such a plea, without advising him of the possible consequences.

The district court subsequently, without further evidence on the point, found that Mrs. von Moltke, at the time of her plea of guilty, was well aware of the death penalty. There was no substantial evidence to sustain this finding.

With regard to the finding that Mrs. von Moltke decided to plead guilty before she received the advice from Collard, and, therefore, was uninfluenced by it, this does not appear to be substantiated by the record. As to the date of her conference with Collard, while she testified that she thought it took place on September 27, she admitted that was only her recollection, and she testified that she might be mistaken as to the date. Collard placed the date as October 2. Under these circumstances, there seems no contradiction between them and it can be assumed that it was October 2. Among other matters that had been discussed prior to this conference with Collard, Mrs. von Moltke had asked Agent Kirby, of the Federal Bureau of Investigation, whether, if all of the others accused of the conspiracy pleaded guilty, she would still have a *right to a trial,* and he answered her, according to his testimony, that in such a case, "the question of the trial would be up to the United States Attorney's office." Furthermore, she was greatly worried over the effect that newspaper publicity would have upon her husband, and had been told that he too would be arrested, unless she pleaded guilty. Hanaway testified that she told him she had decided to plead guilty on certain conditions and he stated to her he would see Mr. Babcock, who was handling the case in the district attorney's office, and convey this information to him. He did so, but Mr. Babcock told him he had no control over questions of deportation, newspaper publicity, or the place where she would serve a sentence if she pleaded guilty, these being matters with which she was concerned. Mr. Babcock testified that a few days after he had seen Hanaway, he had a talk with Mrs. von Moltke in the marshal's office, and at that time, "she was resolving in her mind the question of whether she should or should not plead guilty, and finally advised

me that her then decision was not to plead guilty. * * * I told her that under any circumstances anything I might reply to her questions must not have any bearing whatsoever upon her decision to plead guilty or not plead guilty; that she would have to decide that for herself, on the basis of whether or not in her own conscience she had to say that she was guilty." The government, in its brief, contends no more, on this phase of the case, than that on September 28, Mrs. von Moltke "changed her mind about pleading guilty, and several days later, she decided to plead guilty without any promises." The foregoing seems clearly to indicate that Mrs. von Moltke had not decided to plead guilty prior to October 2; and there is no proof that she was uninfluenced by Collard's advice because she had determined to plead guilty before he counseled her.

Perhaps here it should be said that it appeared on the last hearing that Mrs. von Moltke and her husband owned property in Kiel, Germany, from which income could be secured by one living in that country. She had a son there, before and during the war, and he could avail himself of the income in question. Although her husband was a naturalized American citizen, she was not, although she had a petition pending. Her other two children were born in this country. Her loyalties were divided— if not German—and she seemed to feel that she owed allegiance to Germany until she was granted American citizenship. This feeling was, apparently, based also on the fear that the German government would confiscate the property in Kiel if they learned that she had abandoned her German citizenship. But in spite of these attitudes, subject to question and suspicion, whether her admitted conduct was explicable as innocent or guilty was a question for a jury. And her innocence or guilt of the charge against her is not before us in this proceeding.

In conclusion, there remains to consider the significant statement in the findings of the district court with respect to pleas of guilty in criminal cases. A heavy responsibility undoubtedly was placed upon the shoulders of the district court in this case to "re-create" the circumstances in a case heard by another judge, who, the Supreme Court intended, should report his findings. But that judge had, in the meantime, died. The fact that the writer is not in accord with the findings in this case derogates in no way from the conclusion that the trial judge discharged the duties assigned him most conscientiously and creditably.

In presenting the problem in this case, the court summed it up by saying: " * * if the burden of proof is going to be placed entirely upon the court how can any district judge accept the plea of guilty, in any case unless he places on the record in every instance enough evidence to cover every possible imaginative story that a defendant may concoct when after making his plea of guilty, he recants and brings habeas corpus. Isn't it enough that the judge be assured in his own mind that the prisoner knows what he's doing and knows what his constitutional rights are?"[4]

I do not believe it is enough that the judge, in accepting a plea of guilty, be as-

4. During the trial, counsel for appellant stated to the court that this case had brought about a change in the procedure in the State of Michigan on pleas of guilty, by the adoption of Court Rule 35a. The Rule provides:

"Criminal Procedure—Arraignment and Sentencing.

"In every prosecution wherein the accused is charged with a felony the trial court shall conform to the following practice:

"Sec. 1. Arraignment. If the accused is not represented by counsel upon arraignment, before he is required to plead the court shall advise the accused that he is entitled to a trial by jury and to have counsel, and that in case he is financially unable to provide counsel the court will, if accused so requests, appoint counsel for him. If the accused states he will procure counsel or requests that counsel be appointed, a reasonable time thereafter shall be allowed for counsel to consult with the accused before his plea shall be taken.

"Sec. 2. Imposing sentence. If the accused pleads guilty, after such plea and before sentence the court shall inform the accused of the nature of the accusation and the consequence of his plea; and regardless of whether he is represented by counsel, the court shall examine the accused, not necessarily under oath, and as

sured in his own mind that the prisoner knows what he is doing and what his constitutional rights are. It is possible that a judge might assume, without making a thorough inquiry or sufficiently examining the accused on a plea of guilty, that he knows what the charges mean to which he pleads guilty and the consequences of such a plea. In such a case, it is necessary, on a plea of guilty by a prisoner without legal counsel, that the court make a thorough inquiry and clearly ascertain from the accused that his plea was freely and understandingly made. That was not done in this case.

The evidence discloses that Mrs. von Moltke had no way of obtaining legal counsel except by appointment by the court; that although the court stated it would appoint legal counsel for her immediately after her arraignment, no such counsel was ever appointed; that she did not know of the presumption of innocence but believed the burden, as in Germany, was upon her to prove her innocence; that the only legal advice she obtained was from the agent of the Federal Bureau of Investigation, who used complicated illustrations of the law of conspiracy and advised her erroneously; and that she was never informed of the consequences of a plea of guilty to a crime that carried the death penalty.

For the foregoing reasons, I am of the opinion that the record shows clearly that appellant did not competently, intelligently, and with full understanding of the implications, waive her right to counsel; that her plea of guilty was not understandingly made; and that the findings of the district court to the contrary are not sustained by substantial evidence.

a condition of accepting the plea of guilty and imposing sentence shall ascertain that the plea was freely, understandingly and voluntarily made, without undue influence, compulsion or duress, and without promise of leniency. Unless the court determines that the plea of guilty was so made, it shall not be accepted.

"Sec. 3. Record. The trial court shall cause a stenographic record to be made and promptly transcribed of the proceedings had under sections 1 and 2 above, and shall certify over his signature thereto that the same is a true record of the proceedings had. Thereupon the record so made shall be filed with the clerk of the court and become and be kept as a part of the record in the case. In any subsequent proceedings such record shall be competent evidence of the facts and circumstances therein recorded.

"This rule is mandatory but failure to comply therewith shall not be considered jurisdictional."