**Edgar FULTZ, Petitioner-Appellant,**

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

No. 16381.

United States Court of Appeals
Sixth Circuit.

July 29, 1966.

Edgar Fultz, in pro. per.

Boyce F. Martin, Jr., U. S. Atty., Lexington, Ky., for appellee.

Before PHILLIPS and CELEBREZZE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This is an appeal from an order of the district court denying a petition to vacate a sentence of ten years' imprisonment.

Edgar Fultz is a man to whom life has not been kind. He was born in a mining camp near Harlan, Kentucky, where his father was a coal miner and an alcoholic. Edgar was able to go only to the fifth grade. He is an illiterate. The record discloses little of his life because no testimony was taken before or after he pleaded guilty to taking money, by force and violence, from a federal bank in Louisville, Kentucky, in what appears from the record as one of the most peculiarly executed crimes, if it was a crime, which we have come across.

It appears that Edgar started to work in the mines and, at the same time, to drink liquor, when he was only twelve years old. He had a long history of periodic, severe, alcoholism, and prolonged and immoderate use of drugs.

As stated by the District Attorney at the time of appellant's arraignment, plea, and sentencing on March 16, 1964:

"This defendant is 30 years of age. What happened, he went into the Liberty Bank down on Fourth Street and told them he wanted to make a loan and told the teller to give him a thousand dollars, and they counted him out $70.00, and he took the $70.00, and, thinking he had a thousand, went over to Readmore, which was next door, and was caught."

This is all we know of the crime with which he was charged and for which he was sentenced.

On November 6, 1963, Edgar was arrested for the crime with which he was charged.

On November 7, 1963, a preliminary hearing was requested and granted. On the same day, Edgar was admitted to the Jefferson County Jail, and it appears from the report of the court-appointed psychiatrist that he experienced convulsive seizures, and auditory and visual hallucinations for several days thereafter. About three months later, in early February 1964, agents of the Federal Bureau of Investigation had received information that while Edgar was confined in jail, awaiting the action of the grand jury, he was having a considerable degree of difficulty adjusting to confinement and, at the conclusion of their investigation, it was determined that it would be in the interest of all concerned to have Edgar examined by a qualified psychiatrist, pursuant to 18 U.S.C. Sec. 4244.

On February 14, 1964, after the agents of the Federal Bureau of Investigation had become suspicious of the sanity of the prisoner, the District Attorney filed a motion for a mental examination on the ground that he had "reasonable cause to believe that the defendant may be presently mentally incompetent and unable to understand the proceedings against him, or properly to assist in his own defense. The ground for such belief is based upon interviews with the defendant." The result of the examination has already been recited.

When Edgar's case was called for trial, the following proceedings took place:

"Mr. Rivers (the Assistant District Attorney): Your Honor, at the outset, we had a request that this man be examined by Doctor Trawick because of some information we have, and I've never received a report from Doctor Trawick.

By the Court: Here's the report right here. (Handing document to Mr. Rivers) Let's pass this case at the present time and give you an opportunity to see it.

Mr. Rivers: All right.

(Whereupon, at this point the case was passed for about fifteen minutes and the following proceedings occurred.)

By the Court: United States versus Edgar Fultz.

(Whereupon, at this point the Defendant, without an attorney, and Mr. Rivers stand before the Court.)

By the Court: This defendant is charged with bank robbery. Do you have a lawyer?

Mr. Fultz: No, sir.

By the Court: Mr. Peyton, will you talk with this defendant, please?

Mr. Charles E. Peyton: Yes, sir.

By the Court: (To Mr. Rivers) Let Mr. Peyton see that letter.

(Whereupon, at this point Mr. Charles E. Peyton, a practicing attorney of the Louisville Bar, was duly appointed to represent the Defendant in this matter.)

By the Court: You may talk to the defendant out there, Mr. Peyton.

Mr. Peyton: Yes, sir.

(Whereupon, the following proceedings occurred after the noon recess at about the hour of 2:00 P.M.)

By the Court: Gentlemen, are we now ready in the cases in which counsel has been appointed?

Mr. Peyton: This is Fultz, Your Honor. I'd like to wait until after 2:30 if I could.

By the Court: All right. When you are ready, why, call it to my attention and I'll call the case.

Mr. Peyton: Yes, sir.

(Whereupon, at this point the case was passed until about the hour of 4:00 P.M., at which time the following proceedings occurred.)

By the Court: United States versus Edgar Fultz.

(Whereupon, at this point the Defendant with his Court-appointed Attorney, Mr. Charles E. Peyton, and Mr. Ernest W. Rivers, assistant United States Attorney, stand before the Court.)

By the Court: Does this defendant desire formal arraignment?

Mr. Peyton: Your Honor, on behalf of Edgar Fultz, we admit identity of person, acknowledge receipt of a copy of the indictment, waive formal arraignment and enter a plea of guilty to the Count One of the indictment.

By the Court: All right. A plea of guilty will be entered to the one count of the indictment. Does the Government have a recommendation?"

The District Attorney replied:

"It's the recommendation of the United States, since this man didn't have a pistol, although he indicated so to the teller, that he be given a sentence of 12 years on the one count of the indictment."

In mitigation, Edgar's court-appointed counsel then stated:

"This defendant has had many problems particularly of alcoholism, for quite some time. But it's not only him at this time that we ask the Court to consider. He has a wife and five young children. * * * [His] wife and children are in need, and we plead for the mercy of the Court and as light a sentence as you can possibly give him, because he is—his help is needed at home."

The Court then stated:

"By the Court: The Government, I think, recommended what, 15 years?

Mr. Peyton: Twelve years.

By the Court: It will be the judgment of this Court that this defendant be sentenced to 10 years on the one count of this indictment. He may become eligible for parole at such time as the Attorney General determines. That means that you can become eligible for parole within—prior to serving a third of your sentence.

Custody of the Marshal."

Of course, no testimony having been taken, the statement of the District Attorney that "this man didn't have a pistol, although he indicated so to the teller," is left doubtful and uncertain, since the District Attorney had just previously informed the Court that Edgar went into the bank and told them he wanted "to make a loan," and requested the teller to give him a thousand dollars and they counted him out $70.00, and he took the $70.00, and thinking he had a thousand, went next door, and was caught.

It is an understatement to remark that, from the record before us, there is something strange and incredible about

this occurrence considered as a bank robbery "by force, violence and intimidation." Edgar, it is conceded, did not have a pistol. How "he indicated so to the teller" seems contradictory to everything else the District Attorney said. For he stated that Edgar told them he wanted to make a loan, asked for a thousand dollars and after the teller counted out $70.00, he took that amount, thinking he had a thousand dollars, went next door and was caught. If Edgar asked for a thousand dollars and then received $70.00, which was counted out for him, and he took this amount peaceably and went next door with it, it hardly seems plausible that he could have robbed the bank with force, violence and intimidation by indicating to the teller, in some way, that he had a pistol. Edgar made no demand for the thousand dollars but merely stated that he wanted to make a loan. After they counted out $70.00, there was no demand made that he be given more. He accepted the $70.00 quietly, and went next door. If he had committed a bank robbery, or thought that he had done something wrong, it seems inconceivable that he would just step over next door knowing that he would be immediately caught—which he was. This presents a baffling situation, if Edgar knew what he was doing, or was in his right mind.

We have gone this far into the case because of Edgar's claim on appeal. In the brief which he filed, it is submitted that he was an indigent; that he appeared to the court "somewhat less than reasonably adequate than a normal person." He further states that after spending four and one half months in jail awaiting trial, and after the mental examination, legal counsel was appointed for him by the court on the day of his arraignment, plea and sentence, and that such counsel conferred with him for a maximum of fifteen minutes. He further declares that it was never his intention to plead guilty to bank robbery by force and violence. He said that he had no memory whatever of the facts of the alleged robbery, because of his alcoholism and his physical condition; and that when he realized he was in jail, after the event, he thought that he had been put there because of drunkenness; that when he told his court-appointed counsel of his desire to plead not guilty, under these circumstances, his counsel told him he was "nuts" if he thought the jury would believe that; and that the lawyer would not face the jury with a tale as "wild" or "crazy" as that; that his counsel "scared and threatened me with his repeated talk of a twenty-five year sentence to prison if I did not follow his instructions to plead guilty. And finally he refused to follow my instructions and did enter a plea of guilty on my behalf."

It is not necessary to resolve here the veracity or likelihood of what appellant alleged that his court-appointed counsel told him. Proper and adequate legal advice may be understood in a completely different sense by a man who is suffering from severe alcoholism and drug addiction at the same time. See the recent leading cases holding that chronic alcoholism may be a defense to a charge of unlawful conduct, because of lack of responsibility on the part of one so afflicted. Driver v. Hinnant, 356 F.2d 761, 762 (C.A. 4). Easter v. District of Columbia, 361 F.2d 50 (C.A.D.C.) decided March 31, 1966. At the time in question, appellant was also suffering from the strain of several months' imprisonment awaiting trial, being charged by indictment with the crime of robbery of a federal bank, and having fifteen minutes of consultation with his court-appointed counsel after his case was called for hearing—although the hearing was thereafter postponed for some hours.

Our determination of this appeal rests upon the proposition whether the district judge should have dismissed the petition without an evidentiary hearing; and it is our conclusion, in the light of the record and under the controlling authorities, that it was the obligation of the district judge to conduct such an evidentiary hearing.

In Rule 11 of the Federal Rules of Criminal Procedure, it is provided:

"A defendant may plead not guilty, guilty or, with the consent of the court, *nolo contendere*. The court may refuse to accept a plea of guilty, and shall not accept the plea without first determining that the plea is made voluntarily with the understanding of the nature of the charge. * * *"

The extent to which a court need inquire as to the factual basis for a plea of guilty will vary from case to case. Cerniglia v. United States, 7 Cir., 230 F.Supp. 932. But a plea of guilty should not be accepted unless made voluntarily after proper advice and with full understanding of the consequences. Shelton v. United States, 292 F.2d 346 (C.A.7). Before a trial court may accept a plea of guilty, it must first determine that the plea is voluntarily made, and with an understanding of the nature of the crime. Kennedy v. United States, 249 F.2d 257 (C.A. 5). The fact that the accused is represented by counsel of his choice is insufficient, alone, to relieve the trial court of the duty imposed by the federal rule providing that the court shall not accept a plea of guilty without first determining that the plea is voluntarily made, with an understanding of the nature of the charge. United States v. Davis, 212 F.2d 264 (C.A. 7). The representation of a defendant by counsel when he entered a plea of guilty would not, in itself, fulfill the requirements of the rule that a guilty plea shall not be accepted without first determining that it is made voluntarily with an understanding of the nature of the charge. United States v. Diggs, 304 F.2d 929 (C.A. 6). It is the duty of a federal judge before accepting a plea of guilty to thoroughly investigate the circumstances under which it is made. United States v. Lester, 247 F.2d 496 (C.A. 2).

In Julian v. United States, 236 F.2d 155, 158 (C.A. 6), in reversing a judgment of conviction, where a defendant in a criminal case was represented by his own counsel who, in effect, pleaded the defendant guilty to the charge, the court, after quoting Rule 11 of the Federal Rules of Criminal Procedure, said:

"This is a restatement of previously existing law and practice. Fogus v. United States, 4 Cir., 34 F.2d 97. A plea of guilty, unlike a mere admission or extrajudicial confession, admits every material fact charged and should not be accepted by the court unless made voluntarily after proper advice by counsel and with full understanding of the consequences. Johnson v. Commonwealth, 254 Ky. 775, 777, 72 S.W.2d 472. In order to comply with the rule the District Court need not follow any particular ritual. The prerequisite is that the defendant understands the consequences of the plea, United States v. Swaggerty, 7 Cir., 218 F.2d 875. A brief discussion with the defendant regarding the nature of the charges may normally be the simplest and most direct means of ascertaining the state of his knowledge. United States v. Davis, 7 Cir., 212 F.2d 264. Here the judge neither questioned defendant as to intent, as to whether he had willfully violated the order, as to whether he pleaded guilty, nor discussed the matter with defendant in any way."

The circumstances that constrain us to set aside the order denying the petition to vacate sentence cannot happen again, since the Criminal Justice Act of 1964, Title 18, U.S.C.A. Section 3006 A, has forbidden the method which was followed in the appointment of counsel for appellant, and the nature of the proceedings that heretofore took place in this case in the district court. Now, it is required that counsel be appointed from a panel of attorneys designated or approved by the district court according to an order entered by that court in conformity with the Criminal Justice Act, and such court-appointed counsel may be changed for other counsel by the court at any stage of the proceedings, in the interests of justice.

In this regard, the present case marks the borderline between the old and the new; and counsel for prisoners, finan-

cially unable to obtain counsel of their choice, will not, in the future, be suddenly appointed from among members of the bar who happen to be in the courtroom, and required to plead or go to trial in a criminal case on a few minutes' or on an hour's notice. That kind of thing exemplified the system that prevailed in former times, and, as the Attorney General stated, in his letter to the President (which was made a part of the House Report on the Criminal Justice Act of 1964), constituted "a striking portrait of our Federal Courts' inability to offer equal justice to the poor." *

Now, Congress, in the Criminal Justice Act, has come to the aid of poor people accused of unlawful conduct, and has decided that, in such proceedings, the hurried, hurly-burly days of the past are out. (See Appendix to this opinion.)

Long before the adoption of the Criminal Justice Act, which provides for payment of fees to court-appointed counsel, Chief Judge Denman of the United States Court of Appeals for the Ninth Circuit, in Connelly v. United States District Court, 191 F.2d 692, 695, said, in speaking for the court:

"Every accused person has a constitutional right to counsel and there is

---

\* The letter from the President to the Speaker of the House of Representatives, recommending favorable consideration of the Criminal Justice Act, emphasizes the necessity of such legislation:

"        The White House,
            Washington, March 8, 1963.
Hon. John W. McCormack,
Speaker of the House of Representatives,
Washington, D. C.

Dear Mr. Speaker: To diminish the role which poverty plays in our Federal system of criminal justice, I am transmitting for consideration by the Congress proposed legislation to assure effective legal representation for every man whose limited means would otherwise deprive him of an adequate defense against criminal charges. The need to protect this basic right makes enactment of this measure imperative.

"In the typical criminal case the resources of government are pitted against those of the individual. To guarantee a fair trial under such circumstances requires that each accused person have ample opportunity to gather evidence, and prepare and present his cause. Whenever the lack of money prevents a defendant from securing an experienced lawyer, trained investigator or technical expert, an unjust conviction may follow.

"The Attorney General's accompanying letter describes the deficiencies in the present system. These defects have prevailed for many years despite persistent pleas for legislation by the judicial and executive branches and the organized bar. Fairness dictates that we delay no longer.

"I commend the proposed Criminal Justice Act of 1963 for prompt and

favorable action by the Congress. Its passage will be a giant stride forward in removing the factor of financial resources from the balance of justice.

"Sincerely,
            John F. Kennedy."

The Attorney General, in his letter to the President, above referred to, stated, among other matters:

"Under typical procedures prevailing in the Federal system, no attorney is appointed to represent the needy defendant until he is arraigned, that is, required to plead to the charge against him. The preliminary examination before the commissioner and the grand jury stage pass without the accused having the benefit of counsel or investigation. The case for the defense is then committed to an attorney who will receive no fee for his services or reimbursement for his expenses, and who has no investigators to check facts or experts to analyze evidence. Sometimes these drawbacks will be offset by assigning to the defendant an experienced criminal trial practitioner who may subsidize the defense out of his own pocket. Far more often, however, the assignment will go to a young and inexperienced lawyer, unable to finance the careful search for witnesses and evidence and the time-consuming preparation and trial which an adequate defense may demand. Representation so limited—late in time, lacking in money, and short on experience—is representation far short of that contemplated by the framers of our Constitution."

Legislative History of Criminal Justice Act of 1964, U.S.Code Congressional and Administrative News, 88th Congress, 2d Session, 1964, pp. 2993–2995.

a correlative duty on the bar to see that every accused, no matter how unpopular, is represented competently. In addition to this sense of duty, many eminent lawyers would welcome the professional challenge involved in this case."

The controversy before us, as we have suggested, involves many questions that have not yet been passed upon by the district courts of this circuit, by our court, or by the Supreme Court.

Referring to Judge Denman's words in the Connelly case, supra, we may say that, in addition to their sense of duty, many eminent lawyers would welcome the professional challenge involved in this case.

We assume that appellant is still, since his incarceration, financially unable to obtain counsel, and, accordingly, that the district court will appoint new counsel to represent him on the evidentiary hearing. Title 18 U.S.C.A. Section 3006A (b) and (c). Vinson v. United States, 6 Cir., 235 F.2d 120, 122; United States v. Paglia, 190 F.2d 445 (C.A. 2).

The order of the district court denying appellant's petition to vacate sentence is set aside, and the case remanded for further proceedings in accordance with this opinion.

## APPENDIX

It is difficult to believe that, as late as 1952, the Supreme Court, without opinion, by an equally divided Court, upheld a conviction in a criminal case where a defendant, without funds, asked for appointment of counsel, and the district court appointed a young attorney from a group sitting in the courtroom; whereupon the attorney so appointed, objected, saying he did not want to have anything to do with the case. The court assured him it would be only for the arraignment, and the attorney, then, without seeing the indictment or discussing it with the defendant, told her if she felt she was not guilty, to stand mute, which she did. A plea of not guilty was entered for her; the court never appointed another attorney for her; but on her next appearance in court, she signed a mimeographed form stating that "having been advised by the Court of my right to be represented by counsel, and having been asked by the Court whether I desire counsel to be assigned by the Court, do hereby, in open court, voluntarily waive and relinquish my right to be represented by counsel at the trial of this cause." The court then asked her if she was pleading guilty because she felt she was guilty, and she said "yes." The court did not ask who had explained the indictment to her, and she did not volunteer the information that the only legal advice she had received was from the Federal Bureau of Investigation agent. The court did not explain the indictment to her or tell her what she was charged with. Neither did the court nor the district attorney, nor anyone else, tell her that the crime with which she was charged carried the death penalty. The entire proceeding took only a few minutes of the court's time, sandwiched in between other proceedings. After her plea of guilty, she was remanded to jail to await sentence. Although the following facts of the case are taken from the dissenting opinion, in the Court of Appeals for the Sixth Circuit, they were undisputed; and are as follows:

"Mrs. von Moltke, who was living with her husband and two children, was arrested in her bed at her home between 6:00 and 7:00 in the morning by six agents of the Federal Bureau of Investigation who had been admitted to the house by her husband. She was ordered to get out of bed and dress, while the agents searched the house, after securing her consent, and that of her husband. Mrs. von Moltke was immediately taken to the headquarters of the Federal Bureau of In-

vestigation in Detroit, fingerprinted, photographed, and examined by a physician. She was then subjected to questioning by two agents of the Federal Bureau of Investigation from 10:00 in the morning to 9:00 or 10:00 at night. This questioning continued for five consecutive days. Instead of being placed in a cell, she was locked alone in a room with a solid door, and kept in solitary confinement. She was not allowed to see or speak to anyone. She was not permitted to be visited by her husband or to write a note to him. Her husband did not even know where she was. The matron in charge of her detention was not allowed to speak to her. During this time, she was not told why she had been arrested; no charges had been made against her; she was not allowed to see an attorney; and she was told by the agents that she was not entitled to have an attorney or legal counsel. After five days of solitary confinement, she signed a statement prepared by the agents as a result of questioning her. Nine days after her arrest, she was taken before the Enemy Alien Hearing Board, and at 10:00 o'clock at night, she was subjected to a long examination. Up to this time, she did not know why she was being detained; no charges had been made against her; and she had not been allowed to have legal counsel or see a lawyer. Twenty-six days after her arrest, the matron handed her a copy of the indictment against her for conspiracy to violate the Espionage Act. 50 U.S.C.A. Sec. 31 et seq. Twenty-nine days after her arrest, she was taken before the district court to plead to the indictment. She had no legal counsel, had been given no legal advice, and had not discussed the charges against her with any lawyer or anyone else. When she was brought before the court to plead, the district judge, finding that she was not represented by counsel, stated that she was entitled to legal assistance and would have to have a lawyer to represent her. He called a young attorney from a group sitting in the courtroom and told him to represent her. The lawyer objected and stated that he did not want to have anything to do with the case. The district judge then assured him that it would only be for the arraignment. Upon this assurance and without seeing the indictment or discussing it with Mrs. von Moltke, the attorney had a short whispered conversation with her and told her that if she felt she was not guilty, it was advisable to stand mute; and the attorney then informed the court that the prisoner was standing mute. A plea of not guilty was entered. The district judge then told Mrs. von Moltke that he would appoint an attorney for her 'right away' and she was then taken to the county jail. After being informed by the court that an attorney would be immediately appointed for her, she waited in jail for another seventeen days. No attorney was thereafter ever appointed to represent her on her trial. She again appeared before the court on October 7, 1943, at which time she withdrew the plea of not guilty, which was entered for her when she stood mute, and pleaded guilty. She was then returned to the jail, where she was held for more than twelve months, during the greater part of which time she sought to withdraw the plea, and plead not guilty. Her motion to withdraw the plea of guilty was finally denied on November 15, 1944, and simultaneously, she was sentenced to four years in prison." See Von Moltke v. United States, 189 F.2d 56, 61, 62 (C.A. 6), judgment of conviction affirmed, with one judge dissenting.

There were two appeals in the case. On the first appeal, Von Moltke v. Gillies, 332 U.S. 708, 709, 68 S.Ct. 316, 92 L.Ed. 309, Mr. Justice Black, supported, among others, by Mr. Justice Douglas, wrote a forceful opinion for reversal of the judgment and discharge of the appellant, on

**412**

the ground that she did not have properly appointed counsel devoted to her interest, and that when she pleaded guilty, she did not have a full and complete understanding of her rights. All together, four members of the Court voted in favor of the opinion of Mr. Justice Black; two voted for remand for the purpose of taking additional evidence; three voted for affirmance of the judgment of conviction on the ground that, although the accused was a foreign national and an indigent, and, while the conspiracy with which she was charged was "exceptionally difficult to define in all its legal and factual complexities, there is nothing in the Constitution that prevents an accused from freely, intelligently, and knowingly choosing to plead guilty to that, as well as other complex charges, for reasons best known to the accused, as an alternative to standing trial on that charge. This was her right,"—a *right* of an indigent foreign defendant, without benefit of counsel, to plead guilty to a conspiracy, based on exceptionally difficult legal and factual complexities that carried a possibility of a death sentence, without her ever having known, or having been advised, of such a possible penalty.

On the second appeal, Von Moltke v. Gillies, Supt., 343 U.S. 922, 72 S.Ct. 756, 96 L.Ed. 1335, after two of the Justices, who concurred with Mr. Justice Black in his prior opinion, had died, and had been succeeded by new appointees, the judgment of conviction was affirmed, without opinion, by an equally divided Court, Mr. Justice Clark abstaining.

Such a decision on the part of the Supreme Court, as now constituted, even without recourse to the new Criminal Justice Act, would be unthinkable. It may be observed that, of all of the members of the Supreme Court, who participated in the two Von Moltke appeals, Mr. Justice Black and Mr. Justice Douglas are the only ones who now remain on the Court.